COMMONWEALTH of Pennsylvania,
Appellee

v.

Brett Owen FEESE, Appellant.

Superior Court of Pennsylvania.

Argued March 5, 2013.
Filed Sept. 18, 2013.
Reargument Denied Nov. 27, 2013.

Joshua D. Lock, Harrisburg, for appellant.

Amy Zapp, Office of the Attorney General, Harrisburg, for Commonwealth, appellee.

BEFORE: BENDER, J., SHOGAN, J., and FITZGERALD, J.*

OPINION BY BENDER, J.

Appellant, Brett Owen Feese, appeals from the judgment of sentence of an aggregate term of 4–12 years' imprisonment,[1] imposed for forty convictions involving public corruption, arising out of the use of public funds and manpower for campaign related activities. Appellant asserts five multi-part claims of error. After careful review, we affirm.

Appellant's case arises out of the scandal known as 'Computergate,' a scheme in which taxpayer funds, employees, and other resources were misused for partisan campaign purposes by elected members of the Pennsylvania House of Representatives ("House"), and, in particular, by members of the House Republican Caucus ("HRC"), from 2001–2007. The misused government resources were directed toward the purchase and implementation of technological services, equipment, and data that permitted the analysis of individual voter information for use in political campaigns. Emerging mobile communication technologies designed for political cam-

---

* Former Justice specially assigned to the Superior Court.

1. In addition, the trial court ordered Appellant to pay fines totaling $25,000 and restitution in the amount of $1,000,000.

paign workers ("TelStar") were integrated with massive databases of voter data ("Blue Card") to provide campaign operatives with extensive capabilities to identify and mobilize voters for partisan get-out-the-vote operations and to facilitate direct messaging of information of interest to individual voters or particular groups of voters.

The facts adduced at trial demonstrated that the HRC used taxpayer funds to pay outside contractors to implement and provide ongoing support for these programs from 2001 until 2006. Contractors GCR, Inc. ("GCR") from New Orleans, Louisiana, and Aristotle International ("Aristotle"), from Washington, D.C., worked in tandem with taxpayer funded legislative employees from the Republican Information Technology Services ("RITS") to develop, implement, maintain, and integrate TelStar and Blue Card. During this time, Appellant, an elected member of the House, held various leadership positions with the HRC, where he served both as Director of the House Republican Campaign Committee (HRCC) and Chief Counsel for the HRC. The crux of the instant case revolved around the extent to which Appellant knew of, directed, and/or approved of the illegal use of taxpayer funded resources to develop, implement, and maintain the campaign technologies, as well as his subsequent efforts to cover up his involvement and hinder the investigation of the Office of Attorney General ("OAG").

On July 9, 2010, the OAG filed a criminal information at CP–22–CR–0002585–2010 charging Appellant for crimes committed from 2001–2007. The charges included nine counts of conflict of interest, 65 Pa.C.S. § 1103(a); nine counts of theft by unlawful taking or disposition, 18 Pa. C.S. § 3921(a); nine counts of theft by deception, 18 Pa.C.S. § 3922(a)(1); nine counts of theft of services, 18 Pa.C.S. § 3926(a); nine counts of theft by failure to make required disposition of funds received, 18 Pa.C.S. § 3927(a); one count of hindering apprehension or prosecution, 18 Pa.C.S. § 5105; one count of obstructing administration of law or other government function, 18 Pa.C.S. § 5101; and eleven counts of criminal conspiracy, 18 Pa.C.S. § 903. On May 11, 2011, the OAG filed an additional criminal information at CP–22–CR–0001927–2011 for crimes committed from 2007–2009, therein charging Appellant with an additional four counts: hindering apprehension or prosecution, obstructing administration of law or other government function, and two counts of criminal conspiracy.

Appellant and nine co-defendants were initially charged, however, only co-defendant Jill Seaman proceeded to trial with Appellant; the remaining eight co-defendants entered guilty pleas, some of whom ultimately testified against Appellant and Seaman at trial. Following a twenty-three day jury trial on forty charges, the jury convicted Appellant on all counts.[2] On February 10, 2012, the trial court sentenced Appellant to an aggregate term of 4–14 years' incarceration, and ordered restitution in the amount of $1,000,000. Appellant was also required to pay $25,000 in fines.

Appellant filed a timely notice of appeal. The trial court then filed an order directing Appellant to file a statement of errors complained of on appeal pursuant to Pa. R.A.P. 1925(b), with which Appellant complied.[3] The trial court issued its opinion on June 20, 2012.

---

**2.** The OAG did not proceed to trial on twenty-two counts that had been presented in the criminal informations. The OAG moved to *nol pros* the omitted charges at Appellant's sentencing hearing.

**3.** Additionally, the court ordered Appellant to file a brief in support of his 1925(b) statement

Appellant now raises the following questions for our consideration on direct appeal:

I. WHETHER THE MASSIVE, DELIBERATE DESTRUCTION BY THE [OAG] OF WITNESS INTERVIEW NOTES AND PROFFER STATEMENTS VIOLATED THE DEFENDANT'S RIGHTS UNDER THE UNITED STATES CONSTITUTION, THE CONSTITUTION OF THE COMMONWEALTH OF PENNSYLVANIA, PENNSYLVANIA RULE OF CRIMINAL PROCEDURE 573, PENNSYLVANIA RULE OF PROFESSIONAL CONDUCT 3.8(D), AND DEPRIVED HIM OF A FAIR TRIAL[?]

II. WHETHER THE [HOUSE] HAS THE CONSTITUTIONAL AND STATUTORY RIGHT AND AUTHORITY TO REGULATE THE WORKING HOURS OF ITS OWN EMPLOYEES, SUCH THAT IT WAS ERROR FOR THE TRIAL COURT TO PERMIT THE [OAG] TO PRESENT EVIDENCE THAT ELECTED MEMBERS OR EMPLOYEES OF THE [HRC] COMMITTED A CRIMINAL ACT IF THEY ENGAGED OR DIRECTED OTHERS TO ENGAGE IN ANY CAMPAIGN ACTIVITY DURING A "NORMAL" WORKDAY AS DEFINED BY "REGULAR" DAILY HOURS, RATHER THAN BY REFERENCE TO THE OFFICIAL [HRC] SCHEDULE OF 37.5 HOURS PER WEEK[?]

III. WHETHER THERE WAS SUFFICIENT EVIDENCE PRESENTED BY THE PROSECUTION AT TRIAL TO PROVE BEYOND A REASONABLE DOUBT THAT THE DEFENDANT AUTHORIZED OR DIRECTED ANY EMPLOYEE OF THE [HRC] TO DEVOTE LESS THAN 37.5 HOURS PER WEEK TO LEGISLATIVE WORK; OR THAT ANY SUCH EMPLOYEE IN FACT WORKED LESS THAN 37.5 HOURS PER WEEK[?]

IV. WHETHER THERE WAS SUFFICIENT EVIDENCE PRESENTED BY THE PROSECUTION AT TRIAL TO PROVE BEYOND A REASONABLE DOUBT THAT THE DEFENDANT WAS GUILTY OF OBSTRUCTING ADMINISTRATION OF LAW, HINDERING APPREHENSION, OR CONSPIRACY[?]

V. WHETHER THE CONFLICT OF INTEREST PROVISIONS OF THE PUBLIC OFFICIAL AND EMPLOYEE ETHICS ACT ARE UNCONSTITUTIONALLY VAGUE, OR VAGUE AS APPLIED TO THIS CASE[?]

Appellant's Brief, at 2–3.

### Destruction of Evidence Claims

Appellant's first claim of error asserts that the OAG engaged in prosecutorial misconduct when it allegedly destroyed notes and proffer statements (collectively,

and ordered the Commonwealth to file a brief in response. Appellant timely filed his 1925(b) statement on March 8, 2012, and filed his brief in support of the statement on March 27, 2012. The Commonwealth's response was filed on April 11, 2012, and Appellant filed a supplement brief two days later.

hereinafter, "interview notes,") prepared by OAG agents during interviews conducted with 94 of the witnesses that testified at the Grand Jury. Appellant contends that the destroyed interview notes potentially contained exculpatory and/or impeachment evidence or information that may have led to the discovery of exculpatory and/or impeachment evidence. Appellant argues that the interview notes were destroyed in bad faith and that he was deprived of a fair trial as a result, because his ability to effectively cross-examine the Commonwealth's witnesses regarding prior inconsistent statements was impeded. Appellant asserts that the OAG's destruction of the interview notes violated the OAG's express written policy, the Due Process Clause of the Constitution of the United States; Article 1, Sec. 1 of the Constitution of the Commonwealth of Pennsylvania; the Rules of Criminal Procedure; and the Rules of Professional Conduct, in contravention of relevant state and federal case law.

◼ In the landmark case of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. 1194. The *Brady* rule is not limited exclusively to directly exculpatory evidence. Because the reliability of a witness may ultimately affect a finding of guilt or innocence, the *Brady* mandate also encompasses impeachment evidence. *See U.S. v. Bagley*, 473 U.S. 667, 677, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Thus, the Supreme Court of the United States held that: "[t]here are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have

been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).

Our Supreme Court has explained, however, that the scope of the *Brady* mandate on prosecutors is not boundless:

[T]he [United States Supreme] Court has noted that the duty imposed upon the prosecution under *Brady* is a limited one. *See, e.g., Weatherford v. Bursey*, 429 U.S. 545, 559, 97 S.Ct. 837, 846, 51 L.Ed.2d 30 (1977) ("[t]here is no general constitutional right to discovery in a criminal case, and *Brady* did not create one"); *see also [Kyles v. Whitley*, 514 U.S. 419, 436–37, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) ] ("[T]he Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense.... We have never held that the Constitution demands an open file policy....."). This Court has also recognized *Brady*'s limited requirements, and has noted that *Brady* does not grant a criminal defendant unfettered access to the Commonwealth's files. *See Commonwealth v. Edmiston*, 578 Pa. 284, 851 A.2d 883, 887 n. 3 (2004) (defendant has no general right under the Constitution or *Brady* to search Commonwealth files); *Commonwealth v. Williams*, 557 Pa. 207, 732 A.2d 1167, 1176 (1999) ("[T]he Commonwealth is, in the first instance, the judge of what information must be disclosed.... 'Defense counsel has no constitutional right to conduct his own search of the State's files to argue relevance.'") (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 59, 107 S.Ct. 989, 1002, 94 L.Ed.2d 40 (1987)); *Commonwealth v. Counterman*, 553 Pa. 370, 719 A.2d 284, 297 (1998), *cert. denied*, 528 U.S. 836, 120 S.Ct. 97, 145 L.Ed.2d 82

(1999) (*Brady* is not a general rule of discovery in criminal cases). *Commonwealth v. Lambert,* 584 Pa. 461, 884 A.2d 848, 854 (2005).

Following *Brady,* several dilemmas arose regarding how to address *Brady* claims when the evidence in question had been destroyed. In *California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), a drunk-driving case, the State introduced the results of the defendants' blood-alcohol content ("BAC") tests at trial. The defendant sought to suppress the results because the State failed to preserve the tested samples, a strategy that was initially successful as their convictions were overturned on appeal. However, the Supreme Court of the United States reversed because, first, "the officers ... were acting in good faith and in accord with their normal practice" when the samples were destroyed, and because the "record contain[ed] no allegation of official animus towards [the defendants] or of a conscious effort to suppress exculpatory evidence." *Id.* at 488, 104 S.Ct. 2528. Furthermore, the defendants had failed to show that the evidence of their BAC "possess[ed] an exculpatory value that was apparent before the evidence was destroyed." *Id.* at 489, 104 S.Ct. 2528. Finally, the defendants also failed to show that they "would be unable to obtain comparable evidence by other reasonably available means." *Id.* Notably, the *Trombetta* Court hinted that the failure to show bad faith was the least important of the above considerations; however, the weight of that aside was short-lived.

A few years later, the High Court held that "the Due Process Clause of the Fourteenth Amendment requires the State to preserve evidentiary material that *might be useful* to a criminal defendant." *Arizona v. Youngblood,* 488 U.S. 51, 52, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988) (emphasis added). In *Youngblood,* the defendant was accused and ultimately convicted of child molestation, sexual assault, and kidnaping. *Id.* Criminal investigators collected biological samples from the victim and his clothing soon after the assault occurred, but they only tested the samples to determine if sexual contact had occurred with the victim. *Id.* at 52–53, 109 S.Ct. 333. Blood, saliva, and semen samples collected from the victim and his clothing were not tested for the purpose of comparison with the defendant until nearly two years later, at which time it became apparent that the samples had degraded, having been improperly refrigerated. *Id.* at 53–54, 109 S.Ct. 333. Youngblood's defense at trial rested upon the theory that he had been misidentified by the victim in a photo array and, ultimately, Youngblood was convicted principally on the credibility of the victim's identification. *Id.* at 54, 109 S.Ct. 333.

Youngblood argued on appeal that the he had been deprived of a fair trial because of the State's failure to adequately preserve the biological evidence. The evidence had the potential to exonerate Youngblood, yet it also had the potential to confirm that he had committed the offenses. Thus, it was unclear whether the effectively destroyed evidence was exculpatory and/or whether its omission from the trial was prejudicial. Addressing this dilemma, the Supreme Court of the United States said:

The Due Process Clause of the Fourteenth Amendment, as interpreted in *Brady,* makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence. But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to

tests, the results of which might have exonerated the defendant.

*Id.* at 57, 109 S.Ct. 333.

Consequently, the High Court held in *Youngblood* that: "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.* at 58, 109 S.Ct. 333. Because it was found that the state had not acted in bad faith when it failed to adequately preserve the evidence for future testing, the Supreme Court determined that a *Brady* violation had not occurred.[4] *Id.*

Subsequently, in *Illinois v. Fisher*, 540 U.S. 544, 124 S.Ct. 1200, 157 L.Ed.2d 1060 (2004), the High Court applied *Youngblood* even though the police had destroyed potentially useful evidence *after* the defendant had filed a discovery request for all physical evidence the prosecution intended to use against him at trial. *Fisher*, 540 U.S. at 545, 124 S.Ct. 1200. Fisher was arrested during a traffic stop in 1988 when police observed him to be in possession of a plastic bag containing a white powdery substance. *Id.* State and local crime labs tested the substance and confirmed that it contained cocaine, and Fisher was charged with possession of the substance. *Id.* Fisher filed a motion for discovery that encompassed the seized cocaine eight days after his arrest. *Id.* However, after he was released on bond pending trial, Fisher failed to appear for subsequent court dates, and an arrest warrant was issued. *Id.* Fisher remained a fugitive until 1999, when he was arrested on unrelated charges. *Id.* The State reinstituted the 1988 possession charge against Fisher,

however, the police had already destroyed the alleged cocaine earlier that year in accordance with established procedure. *Id.* at 546, 124 S.Ct. 1200. Fisher filed a motion to dismiss the charges premised upon the destruction of evidence. The motion was denied, and following the subsequent jury trial, he was convicted. *Id.*

The Illinois Supreme Court overturned Fisher's conviction, relying upon reasoning it had previously set forth in *People v. Newberry*, 166 Ill.2d 310, 209 Ill.Dec. 748, 652 N.E.2d 288 (1995), wherein that court had stated:

> Where evidence is requested by the defense in a discovery motion, the State is on notice that the evidence must be preserved, and the defense is not required to make an independent showing that the evidence has exculpatory value in order to establish a due process violation. If the State proceeds to destroy the evidence, appropriate sanctions may be imposed even if the destruction is inadvertent. No showing of bad faith is necessary.

*Newberry*, 209 Ill.Dec. 748, 652 N.E.2d at 292 (internal citations omitted).

The United Supreme Court then reversed the Illinois Supreme Court, advising that in application of the *Youngblood* standard, it had "never held or suggested that the existence of a pending discovery request eliminates the necessity of showing bad faith on the part of police." *Fisher*, 540 U.S. at 548, 124 S.Ct. 1200.

■■ Turning to the instant case, Appellant's claim of prosecutorial misconduct falls within the *Youngblood* mold because it is not known whether the destroyed

---

4. In 2000, due to the emergence of newer and more sophisticated DNA extraction and analysis technologies, Larry Youngblood successfully petitioned for the retesting of the victim's clothing. The results exonerated Youngblood, and he was released from prison with all charges dismissed. Later, in 2001, the results of those tests were compared to national DNA databases, ultimately leading to the arrest and conviction of the actual perpetrator of the sexual assault for which Youngblood had been wrongly convicted.

interview notes contained evidence favorable to him and, relatedly, whether he was prejudiced by the unavailability of that evidence at trial. Because the evidence was destroyed, our inquiry into whether a *Brady* violation occurred is governed by the *Youngblood* standard, and is thus limited to whether the OAG destroyed the interview notes in bad faith.

Appellant makes several distinct arguments in support of his claim that the OAG acted in bad faith by destroying the interview notes—some of which Appellant also asserts as alternative bases for relief. Appellant claims that the OAG's destruction of interview notes in this case: 1) violated the OAG's own internal policy concerning the destruction of such evidence or applied the policy inconsistently; 2) violated Pa. R.Crim.P. Rule 573; and/or 3) violated Pa.R.P.C. 3.8(d). We will address each of these arguments in turn.

Appellant first claims that the OAG failed to follow its own policy concerning the destruction of interview notes and/or that it applied that policy inconsistently. Notably, Appellant does not claim that the policy, as written, violates the *Brady* rule and its progeny, Pa.R.Crim.P. Rule 573, or Pa.R.P.C. 3.8(d). The policy in question was set forth in a memorandum issued by the OAG on July 24, 2001, reproduced in its entirety as follows:

> To eliminate any inconsistencies in the handling of original handwritten notes of an investigation which includes tape recordings, all agents in Criminal Investigations will comply with the following policy:

> Any details within original handwritten investigative notes will be transposed into the investigative report. When an investigative report is approved by the Regional Director/Senior Supervisory Agent/Supervisory Agent, the original investigative notes will be destroyed. The official and only record

of the investigation [("ROI")] is the approved investigative report with listed attachments.

The following are listed exceptions:
- Hand written or typed statements with witnesses, cooperators (actual and potential) and informants that contain a date and signature affixed.
- Investigations that are worked in conjunction with Federal authorities.

> The noted exceptions will require original notes/statements to be maintained as an attachment to the investigative report in the case file. Informant statements will be maintained in the regional/office informant file.

The effective Date of this memorandum is August 01, 2001. OAG Chief Memorandum 2001–02, issued July 24, 2001 (hereinafter "OAG Policy" or "Destruction Policy").

Appellant first contends that the OAG effectively admitted a violation of the above policy when they asserted, in response to Appellant's motion to dismiss due to prosecutorial misconduct, that "proffer notes" had been destroyed. *See* Joint Motion to Dismiss Due to Prosecutorial Misconduct, 7/1/11, at ¶ 11 ("Joint Motion to Dismiss"); *and see* Commonwealth's Response to Defendants' "Joint Motion to Dismiss Due to Prosecutorial Misconduct," ("Commonwealth's Response") 7/15/11, at ¶ 11–12. This allegation is wholly without merit.

In the Commonwealth's Response, the OAG admitted that all "proffer notes" had been destroyed, but specifically asserted that the destruction of the proffer notes occurred in compliance with OAG Policy. Commonwealth's Response, at ¶ 11. Furthermore, the OAG averred that any details contained in the proffer notes had been memorialized in the ROI, that any signed and dated witness state-

ments had been preserved, and that none of the destroyed proffer notes constituted substantially verbatim accounts of a witness's statement. *Id.* at ¶ 2. Clearly, the OAG Policy regulates the destruction of interview notes and, therefore, the mere fact that interview notes were destroyed does not indicate a violation of the policy. To the contrary, the OAG policy *requires* the destruction of interview notes once details have been memorialized in the ROI, with the noted exception of signed and dated witness statements, and substantially verbatim memorializations of witness statements. In our review of the Commonwealth's Response, we discern no admissions that the policy was violated.

Appellant also contends that the OAG destroyed interview notes in bad faith because he asserts that the OAG Policy is inconsistently or selectively applied. To color his argument, Appellant draws our attention to the corruption trial of Michael Veon,[5] the former Democratic Whip of the Pennsylvania House who was convicted of using taxpayer-paid bonuses to reward state workers for campaign efforts, wherein the defendants made discovery requests for notes taken by OAG investigators during proffer interviews with Commonwealth witnesses. Unlike what occurred in this case, however, and in apparent contravention of the OAG Policy, interview notes had not been destroyed in *Veon*, thus making it possible for the *Veon* trial court to grant the defendants' discovery requests for those notes. Appellant claims that the availability of interview notes for discovery in *Veon* demonstrates inconsistent or selective application of the OAG Policy. We disagree.

The *Veon* court's order implementing the discovery request for interview notes

was issued November 12, 2009, one day before Appellant was initially charged. Thus, Appellant complains of "the insidious nature and timing of the destruction" of the interview notes in this case. Relatedly, Appellant posits that the OAG must have been on notice of the potential discoverability of interview notes based upon the actions of the *Veon* court, implying that the interview notes in this case were destroyed after the *Veon* court permitted discovery of similar materials. Therefore, Appellant argues that the interview notes were destroyed in bad faith.

The trial court did not address the timing of the destruction of interview notes; nor do we discern the timing of the destruction from reading the briefs; nor does Appellant direct our attention to any portion of the extensive record in this case that would establish such a timeline. The record does establish that Appellant and his co-defendants were notified at a pretrial conference on November 13, 2009, that interview notes of Commonwealth witnesses in this case had been destroyed, but a date of destruction was not supplied by the OAG at that time. Accordingly, we decline to consider whether the timing of the destruction of the interview notes has any bearing on the question of whether the destruction of interview notes was conducted in bad faith. There is simply no evidence of record that suggests that the interview notes were destroyed after similar notes were made discoverable to the defendants in *Veon*.

 In any event, to the extent that Appellant claims that the Commonwealth was on notice that the interview notes were potentially discoverable after the actions of the *Veon* court, *Fisher* makes it

---

**5.** *Commonwealth v. Michael Veon*, CP–22–CR–0004656–2008. Veon was one of five defendants requesting discovery of interview notes in *In re: Twenty–Eighth Statewide Inves-*

*tigating Grand Jury*, No. 10 M.D.2008 (Dauphin Co.2008). For the sake of brevity, these cases are collectively referred to hereinafter as the *"Veon* case."

clear that "bad faith" is the only dispositive issue under the *Youngblood* standard. The defendant in *Fisher* had specifically requested the seized evidence in a discovery motion prior to the destruction of evidence that was conducted pursuant to police policy. Nevertheless, the *Fisher* court determined that the "existence of a pending discovery request [does not] eliminate[] the necessity of showing bad faith[.]" *Fisher*, 540 U.S. at 548, 124 S.Ct. 1200. Here, Appellant is in an even weaker position than the defendant in *Fisher*, both because Appellant has not established that the timing of the destruction of interview notes occurred after "notice" was provided, and because the "notice" provided in this case was not a straightforward discovery request, but the action of another court, without precedential value, and in an unrelated case.

Instead, we are left with the question of whether the failure of the OAG to destroy similar interview notes in *Veon* demonstrates selective application of the OAG policy. We conclude that it does not. Despite the OAG's failure to comply with the OAG Policy in *Veon*, there is every indication that it was followed in the instance case, and Appellant does not provide any other evidence of instances of the OAG's failure to comply with the Destruction Policy but for what occurred in *Veon*. There is nothing in the record that indicates whether the failure of the OAG to following the Destruction Policy in *Veon* was anything more than an isolated incident. Nor does the record disclose the reason or cause of the OAG's non-compliance. Under these circumstances, we conclude that Appellant's allegation of selective enforcement is too speculative to support his claim that

the interview notes were destroyed in bad faith.[6]

We next consider whether the destruction of interview notes violated Pa. R.Crim.P. Rule 573. Rule 573 governs pretrial discovery and inspection in criminal court. That Rule provides in pertinent part as follows:

**(B) Disclosure by the Commonwealth.**

(1) *Mandatory.* In all court cases, on request by the defendant, and subject to any protective order which the Commonwealth might obtain under this rule, the Commonwealth shall disclose to the defendant's attorney all of the following requested items or information, provided they are material to the instant case. The Commonwealth shall, when applicable, permit the defendant's attorney to inspect and copy · or photograph such items.

(a) Any evidence favorable to the accused that is material either to guilt or to punishment, and is within the possession or control of the attorney for the Commonwealth;

. . .

(2) *Discretionary With the Court.*

(a) In all court cases, except as otherwise provided in Rules 230 (Disclosure of Testimony Before Investigating Grand Jury) and 556.10 (Secrecy; Disclosure), if the defendant files a motion for pretrial discovery, the court may order the Commonwealth to allow the defendant's attorney to inspect and copy or photograph any of the following requested items, upon a showing that they are material to the

---

6. Notably, the explicit purpose of the Destruction Policy as set forth in OAG's memorandum was to "eliminate any inconsistencies" in the handling of interview notes. OAG Chief Memorandum 2001–02, *supra*. Although we agree with Appellant that selective

enforcement of the Destruction Policy may provide a basis for establishing that the OAG destroyed the interview notes in bad faith, demonstrating selective enforcement requires more than citation to a single and potentially isolated instance of non-compliance.

preparation of the defense, and that the request is reasonable:

. . .

(ii) all written or recorded statements, and substantially verbatim oral statements, of eyewitnesses the Commonwealth intends to call at trial;

(iii) all written and recorded statements, and substantially verbatim oral statements, made by co-defendants, and by co-conspirators or accomplices, whether such individuals have been charged or not;

Pa.R.Crim.P. 573.

Rule 573 dictates that certain evidence is always discoverable upon a defendant's request, and includes "Any evidence favorable to the accused that is material either to guilt or to punishment, and is within the possession or control of the attorney for the Commonwealth." Pa.R.Crim.P. 573(B)(1)(a). Thus, section (13)(1) largely mirrors the dictates of *Brady*. Section (13)(2) governs discretionary disclosure requirements, whereby a defendant must demonstrate to the trial court that a discovery request is "reasonable" and that the evidence sought is "material to the preparation of the defense." Pa.R.Crim.P. 573(B)(2)

It is unknown whether the interview notes in question were "material either to guilt or to punishment" because they were destroyed. Pa.R.Crim.P. 573(B)(1)(a). The discretionary provisions of Rule 573 appear to set a lower standard, however, whereby the trial court "may order" that "all written or recorded statements, and substantially verbatim oral statements" of co-defendants or witnesses the Commonwealth intends to call to trial be provided to the defense if that evidence is "material to the preparation of the defense" and if the request is reasonable. Pa.R.Crim.P. 573(B)(2). Thus, Section (13)(2) is arguably broader in scope than Section (13)(1) in the sense that it covers evidence that is merely "material to the preparation of the defense" rather than "material either to guilt or to punishment." On the other hand, Section (13)(2) is narrower in scope in that it is limited to certain species of evidence (in this case, written, recorded, and substantially verbatim statements of witnesses and co-defendants), and because the court may exercise its discretion in limiting discovery of such evidence, whereas disclose under Section (13)(1) is mandatory.

■ Nevertheless, because the interview notes in question were destroyed, neither the trial court nor this Court is in a better position to determine whether the destroyed evidence was "material to the preparation of the defense" than we were in determining whether that evidence was "material either to guilt or to punishment." Accordingly, it is impossible to conclude whether either provision of Pa.R.Crim.P. 573 was violated in this instance based upon a direct examination of the record.

Appellant argues, however, that there is testimony of record that *suggests* that written, recorded, or substantially verbatim statements were taken from certain witnesses. Because those witnesses were not specifically named in the ROI, and because there are no written, recorded, or substantially verbatim oral statements by those witnesses preserved as attachments to the ROI, Appellant argues that logic dictates that such evidence was destroyed. Appellant offers several examples, corresponding to witnesses Robert Haines, Beth Culp, Lori Cherry McGill, John Hanley, and William Tomaselli.

During Robert Haines' Grand Jury testimony, the following exchange occurred:

Mr. Blessington: "And we have actually had an opportunity to meet before and discuss with you the type of things we're going to be asking you about today, correct?"

Mr. Haines: "Correct."

Grand Jury Notes of Testimony, 8/20/08, at 2.

Later, the following exchange occurred:

Mr. Blessington: "Just from 01 when this whole Blue Card thing starts to the end of '06 to the end of the election of '06, what percentage of your time would you say was dedicated-your work time was dedicated to campaign/political type activities?"

Mr. Haines: "I know before I said 30 percent, but I think after reviewing my e-mails the last couple of years it was probably 70 percent."

Mr. Blessington: "So you said 30 percent when you first met with us and I appreciate your conscientiousness. I really do."

*Id.* at 41.

During Beth Culp's Grand Jury testimony, the following exchange occurred:

Mr. Blessington: "Correct me if I'm wrong, but on election day, Brett Feese and Jill Seaman ask various people to work election day, correct?"

Ms. Culp: "Probably."

Mr. Blessington: "Probably is not going to work."

Ms. Culp: "Okay."

Mr. Blessington: "That's what you told us before, is that true?"

Ms. Culp: "Okay."

Grand Jury Notes of Testimony, 3/11/09, at 14.

During Lori Cherry McGill's testimony, the following exchange occurred:

Mr. Fina: "Let me read something from our prior discussion. If you disagree with it tell me. I have down here in our past discussion, you told us that they, meaning District Operations people, Hanley, track those districts that were likely to be tough re-elections and dedicated lots of resources to those districts, is that a fair statements [sic] or is that-"

Ms. Cherry McGill: "No, I really wouldn't have any way of knowing what resources they dedicated to those districts."

Grand Jury Notes of Testimony, 9/30/09, at 14.

Appellant avers that the ROI contained no mention of prior interviews with Haines, Culp, and Cherry McGill. However, with the possible exception of McGill's testimony, there is no direct inference to the existence of a written or recorded interview, nor to a substantially verbatim oral statement. The fact that the specifics of the witnesses' stories changed from the time they initially spoke with OAG agents until their testimony before the Grand Jury does not indicate that the OAG had collected written or recorded statements, or substantially verbatim oral statements, from those witnesses. In any event, neither Haines, Culp, nor Cherry McGill actually testified against Appellant at his trial. Thus, any value of prior inconsistent statements as impeachment material was rendered moot by their absence.[7]

However, Hanley and Tomaselli did testify extensively for the Commonwealth at Appellant's trial. Hanley, Appellant notes, testified that he spoke with the OAG

---

7. To the extent that they could have provided exculpatory testimony, there is nothing of record to indicate why these witnesses could not have been called by the defense, particularly since the transcripts of the Grand Jury were clearly available to the defense before trial, and these particular excerpts from the Grand Jury testimony were set forth in the defen-

dants' Joint Motion to Dismiss and, thus, known to Appellant prior to his trial. Joint Motion to Dismiss, at ¶¶ 13–15. It is only the prior statements, and not the witnesses, that would have been rendered unavailable if the OAG destroyed interview notes related to those witnesses.

"probably eight times." N.T., 10/18/11, at 261. He was called to testify before the Grand Jury "multiple times" and he was subpoenaed to appear at two preliminary hearings in this matter. *Id.* at 261–62. Despite the frequency with which Hanley met with the OAG (Appellant does not cite any portion of the record that would indicated how often Tomaselli met with the OAG prior to Appellant's trial), the ROI "did not even record, much less transpose the contents of, a single interview of either John Hanley or William Tomaselli." Appellant's Brief, at 42. With respect to Hanley's testimony, Appellant claims that "[i]t is clear from a review of Mr. Hanley's trial testimony . . . that his version of what occurred evolved throughout his meetings with the OAG" and, thus Appellant concludes, "[a]ny suggestion that this would not have been useful during the cross-examination of Mr. Hanley is specious." *Id.* To support this proposition, Appellant cites to 177 pages of the reproduced record which constitutes over 700 pages of the original trial transcripts.

Appellant's failure to cite with any degree of specificity particular passages from Hanley's testimony to demonstrate the proposition that his version of events evolved so substantially as to render prior recorded or verbatim statements materially useful for cross-examination is suspect. Still, even if we were to assume the validity of that proposition, it does not follow that the evolution of Hanley's perspective demonstrates that: 1) written, recorded, or substantially verbatim oral statements were gathered from the OAG's interviews with Hanley, or 2) that such hypothetical interview notes were destroyed, or 3) that those hypothetical interview notes were destroyed in bad faith. Appellant's claim amounts to no more than pure speculation that because Hanley met frequently with the OAG, or that because his testimony was extensive and critical to the Commonwealth's case against Appellant, that writ-

ten, recorded, or substantially verbatim oral statements *must have been generated* from his numerous meetings with the OAG. Notably, when Hanley revealed that he had met with the OAG on at least eight occasions during cross-examination, there were no follow-up questions by defense counsel eliciting or attempting to elicit whether written, recorded, or substantially verbatim oral statements had been produced. With respect to Tomaselli's testimony, Appellant's claims are even more speculative, because Appellant does not cite to any portion of the record that would suggest Tomaselli met with the OAG prior to Appellant's trial.

Ultimately, Appellant's assertion that interview notes, in the form of written, recorded, or substantially verbatim oral statements, were destroyed in violation of Rule 573 and, therefore, in bad faith, is simply too speculative. There is absolutely no direct evidence of the destruction of such evidence, nor even any strong indirect evidence that would permit a reasonable inference that such evidence must have been destroyed. There can be no finding of bad-faith-destruction-of-evidence without the prerequisite showing that evidence was, in fact, destroyed.

Finally, Appellant claims that the OAG violated Pennsylvania's Rules of Professional Conduct by destroying interview notes. Appellant specifically alleges that the OAG violated Pa.R.P.C. 3.8(d), which provides, in part, that:

The prosecution in a criminal case shall:

. . .

(d) make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense. . . .

Pa.R.P.C. 3.8(d).

The foundation of Appellant's claim is, again, simply too speculative, because, as

discussed extensively above, there is absolutely no evidence of record that demonstrates that evidence favorable to Appellant was destroyed in this case that was not preserved in some form in the ROI. Without a sufficient showing that evidence was destroyed, Appellant cannot claim a violation of Pa.R.P.C. 3.8(d).

Appellant's numerous attempts to demonstrate that the OAG destroyed, in bad faith, interview notes in the form of written, recorded, or substantially verbatim oral statements of the Commonwealth's witnesses lacks a sufficient foundation in the record. To demonstrate bad faith, Appellant must at least make a sufficient showing that such evidence was destroyed in the first place (independent of their value as *Brady* material) before we can ever reach the question of whether such hypothetical actions occurred in bad faith. Regardless, the trial court determined that the OAG followed its Destruction Policy, and Appellant has not presented sufficient evidence to contradict that finding. Appellant has failed to offer anything more than pure speculation that the OAG's policy was promulgated or enforced in bad faith. As was the case in *Fisher*, it is not enough to demonstrate that a defendant is entitled to the destroyed evidence under *Brady* because of its *potential* to exculpate, or for its potential to provide impeachment material. When the value of such evidence was not clear before its destruction, the burden is on the defense to demonstrate bad faith. We conclude that Appellant has failed to make a sufficient demonstration of bad faith.

### Separation of Powers

In Appellant's next claim, he asserts that the trial court erred when it permitted the OAG to present evidence that he or other elected members or employees of the HRC engaged in or directed others to engage in campaign activity during normal workday hours ("the disputed evidence"),

rather than by reference to the official HRC policy requiring only that such employees work a minimum of 37.5 hours per week. Appellant asserts that HRC, and by extension, Appellant, had the constitutional authority to "establish flexible working schedules for his staff outside their 'normal' working hours." Appellant's Brief, at 48. Appellant contends that any testimony or other evidence concerning whether legislative staff engaged in campaign activities during an otherwise typical workday schedule (*i.e.*, 9:00 a.m. to 4:30 p.m.) should not have been admitted because HRC regulations set forth in the House Republican Caucus Employee Policy Handbook ("HRC Employee Handbook") required only that legislative staff work a minimum of 37.5 hours a week. Thus, Appellant argues, evidence of a legislative employee's work on campaign activity during a typical workday is irrelevant when an employee could fulfill his or her 37.5 hour requirement before or after typical workday hours, or during weekends. Appellant posits that by permitting introduction of the disputed evidence, the trial court allowed an organ of the executive branch of Pennsylvania (the OAG) to mandate the working hours of the legislative branch in violation of the separation of powers doctrine. We disagree, and conclude that the trial court did not err when it permitted the introduction of the disputed evidence.

■■ "The admissibility of evidence is within the 'sound discretion' of the trial court, 'which may only be reversed upon a showing that the court abused its discretion.'" *Commonwealth v. Bryant*, 57 A.3d 191, 194 (Pa.Super.2012) (quoting *Commonwealth v. Simmons*, 541 Pa. 211, 662 A.2d 621, 633 (1995)). "An abuse of discretion occurs when a trial court, in reaching its conclusions, overrides or misapplies the law, or exercises judgment which is

manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will." *Commonwealth v. Brown*, 839 A.2d 433, 435 (Pa.Super.2003).

Article 3, Section 17 of the Pennsylvania Constitution provides that:

> The General Assembly shall prescribe by law the number, duties and compensation of the officers and employees of each House, and no payment shall be made from the State Treasury, or be in any way authorized, to any person, except to an acting officer or employee elected or appointed in pursuance of law.

Pa. Const. art. III, § 17.

Exercising this constitutional authority, the General Assembly established that:

> The Majority and principal Minority Party Caucuses shall each establish a Legislative Management Committee which shall be composed of the Floor Leader, who shall be chairman, and so many additional caucus members as may be determined by each caucus. Each such committee shall select a staff administrator who shall, under supervision of the committee, administer the fiscal and personnel affairs of the caucus and perform such other duties as may be assigned.

46 P.S. § 42.121c.

The HRC, through its Legislative Management Committee, adopted the HRC Employee Handbook for employees of the Caucus working in Harrisburg. From 2000–2007, the HRC Employee Handbook provided as follows:

**I. Work Schedule**

A. Regular Work Week Schedule

All employees are expected to work a minimum work week of 37.5 hours. Subject to the approval of the [Republican Human Resources Director], the appointing authority may establish work schedules for his or her employees.

A. Half–Day Schedule

A half-day constitutes leaving for the day at 12:45 or arriving for the day at 12:45 (no lunch hour is included).

HRC Employee Handbook, at 30.

The trial court found that although the HRC Employee Handbook provided for workday flexibility, "witnesses testified that when hired they were told that the HRC working hours were 9:00 A.M. to 4:30 P.M." Trial Court Opinion (TCO), at 16 (citing N.T., 10/7/11, at 74–76; 10/14/11, at 14–15, 75; 10/17/11 at 5, 70, 88; 10/21/11 at 27). Additionally, the HRC Director of Human Resources from 2004–2009 testified that "when she interviewed a potential caucus employee she told the person that the working hours were 9:00 A.M. to 4:30 P.M." *Id.* (citing N.T., 10/25/11 at 24). Furthermore, the trial court found that:

> the section of the Employee Handbook to which Appellant cites ... states a policy for a "Half–Day Schedule" which "constitutes leaving for the day at 12:45 or arriving for the day at 12:45 (no lunch hour is included)." The specific hour designation for the half-day schedule, coupled with the definite understanding of multiple HRC employees of the required hours at which they were to be present at work runs counter to the Appellant's position that there was an inherent policy of flexibility when an employee's legislative-related work duties were to be performed.

*Id.* (internal citation omitted).

The trial court went on to conclude that Appellant's separation of powers claim was specious. The trial court failed "to understand how the evidence presented amounts to a mandate of HRC employee work hours by the OAG" particularly since "there was some understanding by HRC employees and management of the expected work hours independent of any motive on the part of the OAG, as perceived by

Appellant, in introducing 'workday' evidence." *Id.*

We agree with the trial court. Here, the evidence offered by the Commonwealth tended to establish that despite an official policy that permitted flexibility, HRC employees testified that they were explicitly told that their workday would be from 9:00 a.m. to 4:30 p.m. This evidence was buttressed by the testimony of the HRC's Director of Human Resources, and by the fact that the official policy regarding half-days contained in the HRC Employee Handbook implied a standard work day by default, even if a 9:00 a.m. to 4:30 p.m. workday was not mandated. Appellant's contention to the contrary—that the official policy and actual practice was one of flexibility—may tend to contradict the Commonwealth's evidence, but it does not provide a basis for exclusion of the Commonwealth's evidence on separation of powers grounds.

■ We also agree with the trial court that the admission of evidence offered by the Commonwealth at trial in no way constitutes an executive act mandating the working hours of legislative employees, and Appellant fails to cite any authority that would suggest otherwise. Although Appellant cites several authorities that do suggest that each of the legislative, judicial, and executive branches enjoy exclusive authority to select, supervise, and discharge their own employees without the interference of other branches, it does not follow that the introduction of evidence of any nature at a criminal trial for public corruption constitutes usurpation or interference with the authority of the legislative branch.

In *L.J.S. v. State Ethics Commission,* 744 A.2d 798 (Pa.Cmwlth.2000), a case cited by Appellant to support his argument, the Commonwealth Court was asked to determine whether the petitioner, a county's chief probation officer, was a judicial employee or a public employee, the latter of which would have subjected the petitioner to the provisions of the State Ethics Act. The court ultimately decided that the petitioner was a judicial officer and, therefore, the State Ethics Commission could not pursue action against him under the State Ethics Act, as such action would violate the separation of power doctrine. In response to arguments that the court's action would immunize the petitioner from criminal prosecution, the court disagreed, stating that "a judicial officer is not immune from criminal prosecution, and like any citizen is subject to investigation by the proper authority for any criminal activity." *Id.* at 803 (citing *Commonwealth v. Larsen,* 452 Pa.Super. 508, 682 A.2d 783 (1996)).

*L.J.S.* is not on point and, in any event, it contradicts more than it supports Appellant's position. The act of investigating a judicial employee for violating a tenet regulating public employees is not analogous to the criminal prosecution of a legislative official for criminal violations, and it is even less analogous to the act of introducing evidence at a criminal trial. The purpose the executive action in this case was to present evidence of a violation of criminal statutes; it was not an effort to usurp the legislative authority to regulate its own employees, nor would the resulting criminal conviction dictate the future terms of legislative employment. We conclude, therefore, that the OAG's act of seeking admission of the disputed evidence did not constitute executive action implicating the separation of power doctrine.

■ Appellant's claim of error lacks merit for another reason as well. The Commonwealth adds, and we agree that:

there is a significant, basic flaw in Feese's argument that the "37.5 hour requirement" should have somehow been a yardstick for assessing the ad-

missibility of evidence, namely, the implicit belief that, once an employee has rendered the required 37.5 hours of work, it becomes legal for a public official to assign the employee to campaign work. As this Court's decision in *Commonwealth v. Habay*, 934 A.2d 732 (Pa.Super.2007) instructs, the essential consideration is not whether a public employee has worked a full week, but rather whether someone who has authority over that employee incurs a pecuniary benefit by assigning that employee to do campaign work.

Commonwealth's brief, at 36.

Appellant complains that the Commonwealth falsely construes *Habay* as defining the legislative workday, but we disagree with Appellant's characterization of the Commonwealth's argument. The Commonwealth makes no such assertion. The issue is that Appellant is attempting to construe a conflict in the evidence, a factual issue that should ordinarily be resolved by a jury, as a legal issue that would self-servingly exclude evidence unfavorable to him. Appellant would have us read the official policy of flexibility contained with the HRC Employee Handbook as the applicable legal standard rather than as a mere factual circumstance bearing on whether he had violated the law. However, the law in question is not defined by the accused's compliance with official policy, but, as this Court stated in *Habay*:

> to prove that a defendant violated the conflict of interest statute, the Commonwealth must show beyond a reasonable doubt: (1) the defendant was a public official; (2) the defendant knowingly or intentionally used the authority of his or her office for private pecuniary gain; and (3) the gain was more than *de minimis*.

934 A.2d at 736.

Thus, for each of the aforementioned reasons, we conclude that the trial court did not abuse its discretion when it permitted the OAG to introduce the disputed evidence.

### Sufficiency of the Evidence Claims

In Appellant's next issue, he contends that "the evidence at trial was not sufficient to prove beyond a reasonable doubt that the defendant authorized or directed any employee of the [HRC] to devote less than 37.5 hours per week to legislative work; or that any such employee in fact worked less than 37.5 hours per week." Appellant's Brief, at 53. Presumably, Appellant challenges the sufficiency of the evidence with respect to his convictions for conflict of interest, 65 Pa.C.S. § 1103(a). However, as the Commonwealth notes, Appellant never specifically identifies toward which offenses his sufficiency challenge is directed. Appellant argues that:

> At trial, multiple employees of the House testified at great length, but not a single witness ever said that Mr. Feese authorized or directed them to devote less than 37.5 hours per week to their Legislative duties. Likewise, no evidence was ever presented at trial to show that Mr. Feese in any manner acted as an accomplice or co-conspirator in the actions of Co–Defendants or alleged Co–Conspirators John Perzel, Brian Preski, Bill Tomaselli, Tony Painter, Buzz Stokes, or anyone else in directing or authorizing any House employee to devote less than 37.5 hours per week to their Legislative duties.

*Id.*

Nearly all of Appellant's argument is geared toward challenging the conflict of interest convictions, although he never specifically cites the relevant statute or its elements. We will review Appellant's sufficiency claim with respect to those convictions, as it is apparent that his sufficiency claim, as articulated, directly relates to his

six convictions for conflict of interest at CP–22–CR–0002585–2010. However, we conclude that Appellant has failed to preserve any sufficiency claims regarding his theft and conspiracy convictions at CP–22–CR–0002585–2010.[8]

The standard we apply in reviewing the sufficiency of evidence is whether, viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the factfinder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for that of the factfinder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Lambert,* 795 A.2d 1010, 1014–15 (Pa.Super.2002) (quoting from *Commonwealth v. Hennigan,* 753 A.2d 245, 253 (Pa.Super.2000)) (internal citations and quotation marks omitted).

The trial court succinctly addressed Appellant's sufficiency claim as follows:

A voluminous amount of testimony and other evidence was presented during the course of the instant trial. Many witnesses who were working as HRC employees as part of Appellant's staff for which he was responsible to supervise testified to performing campaign related work while being paid with taxpayer funds, including the amount of time in percentage form that was spent on non-legislative activities. (See N.T. 10/13/11, at 95–96; 132–135; 139–141; 173; 10/14/11 at 10, 11–14; 16–17; 10/19/11 at 148–155; 10/20/11 at 127–129). It is not unreasonable for a jury to infer that employees who Appellant supervised were acting with direction. Further, evidence was presented to show that Appellant was specifically aware of non-legislative work, such as political fundraising, being performed by state employees under his supervision, in his office, during the workday. (N.T. 10/17/11 at 7–13; 24; 20–24; 67–47; 76–78; 85–87). This Court finds that sufficient evidence was presented to enable the jury to make inferences, evaluate witness credibility[,] and draw conclusions.

TCO, at 18–19.

Appellant cites several excepts of trial testimony to demonstrate that, although certain witnesses testified to devoting a significant percentage of the time to campaign work, their testimony did not establish that they spent less than 37.5 hours on legislative work during any given week.

8. Appellant failed to specifically raise any claim in his Pa.R.A.P. 1925(b) statement of errors complained of on appeal concerning the sufficiency of the evidence with respect to his various convictions for theft and conspiracy at CP–22–CR–0002585–2010. Accordingly, to the extent Appellant attempts to raise such claims couched within the instant sufficiency claim, we conclude that those claims have been waived. *See Commonwealth v. Lord,* 553 Pa. 415, 420, 719 A.2d 306, 309 (1998) ("Any issues not raised in a 1925(b) statement will be deemed waived.").

Appellant's Brief, at 54–59. RITS employees Keith Paulkovitz, Robert Haines, and Andrew Mummert testified that, respectively, 40 percent, 70 percent, and 40 percent of their workload was campaign related.[9] N.T., 9/27/11 (a.m.), at 87; 9/27/11 (p.m.), at 93; 9/28/11 (p.m.), at 111. Deborah Hannon, also an employee of RITS, testified that she spent 100 hours on campaign work from 2001–2006. N.T., 9/28/11 (p.m.), at 111. Lauren Gutshall, who worked in several offices of the HRC, said that approximately 20 percent of her time was spent working on campaign matters, which was true whether she worked 37.5 or 60 hours a week, and that the figure could rise to 80 percent during the weeks preceding an election. N.T., 10/17/11, at 123–24.

Appellant also cites the testimony of John Hanley, who was simultaneously Director of District Operations for the HRC and Executive Director of the HRCC. Hanley testified that he was aware of and made his staff aware of the 37.5 hour requirement, and, to the best of his ability, he attempted to have his staff comply with that requirement. N.T., 10/19/11, at 211–12. Testimony provided by Stephen Dull, an HRC employee, indicated that he always fulfilled his 37.5 hour legislative work requirement despite engaging in frequent campaign activities, and he believed that his experience was equally true for other HRC employees. N.T., 10/21/11 (a.m.), at 59–60.

Other witnesses testified that they often worked extremely long hours, particularly when the House was in session. For instance, Elmer Bowman, an employee in Appellant's legislative office, testified that he usually arrived at work before 8 a.m. and did not leave until 7 or 8 p.m., and when the House was in session, he might stay as late as 3 a.m. N.T., 10/13/11, at 268–70. This did not include the time Bowman spent working from home answering and sending emails, which often extended his work-week into the weekend. *Id.* at 270. Likewise, Appellant's three secretaries testified that they frequently worked overtime at their legislative duties, eating lunch at their desks and staying late when the House was in session, and would often work weekends on legislative tasks.

Appellant claims that the manner in which these employees described the proportion of their time spent on campaign work left a reasonable doubt as to whether they had fulfilled their 37.5 hours-per-week obligation. For example, if Paulkovitz worked 80 hours a week, and spent 40 percent of that time on campaign activity, that left 48 hours per week potentially spent on legislative work. Thus, Appellant contends, having failed to demonstrate that these employees worked less than 37.5 hours per week on legislative duties, the Commonwealth failed to demonstrate sufficient evidence that such employees had worked on campaign activities at public expense.

 As was true with respect to Appellant's previous claim, however, Appellant conflates the HRC Employee Handbook policy requiring HRC staff to work 37.5 hours per week with the elements of the offense with which he was charged. The conflict of interest statute requires only that: (1) the defendant was a public official; (2) the defendant knowingly or intentionally used the authority of his or her office for private pecuniary gain; and (3) the gain was more than *de minimis*. *Habay*, 934 A.2d at 736. Thus, the failure of the Commonwealth to demonstrate that HRC employees worked less than 37.5

---

9. With respect to Paulkovitz and Haines, these percentages were given with respect to their work for RITS from 2001–2006. Mummert offered a percentage related to his work from 2003–2006, as he did not begin working for RITS until 2003.

hours per week on legislative matters has no bearing on whether those employees were utilized for non-*de minimis* private pecuniary gain. Furthermore, the element of private pecuniary gain extends beyond the economic advantage attributable to the tax-payer funded salaries of HRC employees. In *Habay*, we found the second element of the conflict of interest statute fulfilled where "the employees utilized [Habay]'s legislative office and office equipment in the course of those political endeavors. Consequently, [Habay] received the benefit of using those resources while not having to pay for them." *Id.* Similarly, here, the substantial time spent by HRC employees on campaign activities indicates that other taxpayer funded resources were utilized, regardless of whether those employees had fulfilled the 37.5 hour per week obligation to perform legislative work. Furthermore, there was little indication during the testimony of HRC employees mentioned above that they were simply acting as volunteers when they engaged in campaign work. Thus, if taxpayer funded salaries of HRC employees were made contingent upon their participation in campaign activities, that would also constitute a private pecuniary gain realized when their salary and accompanying benefits are leveraged to induce them to "volunteer" for campaign work.

■ We conclude, therefore, that viewed in a light most favorable to the Commonwealth, sufficient evidence was provided to demonstrate, by both direct evidence and by inference, that state employees under Appellant's supervision were utilized to work on campaign activities at taxpayer expense. The jury could reasonably infer that based upon the substantial percentage of time those employees spent on campaign matters, at least some amount of that time inevitably came at the taxpayer's expense. Even if particular employees fulfilled their 37.5 hours of legislative work pursuant to the HRC Employee Handbook policy, there was ample evidence that the authority of Appellant's office was used by him for private pecuniary gain, as sufficient evidence demonstrated that taxpayer funded offices and equipment were used for campaign purposes, and it was reasonable for the jury to infer that those employees did so under Appellant's direction. Accordingly, Appellant's sufficiency claim lacks merit.

## Sufficiency of the Evidence—Obstruction of Justice and related Conspiracy Convictions

Appellant next claims that the Commonwealth failed to present sufficient evidence that Appellant was guilty of hindering apprehension or prosecution, obstructing administration of law or other government function, and two counts of criminal conspiracy at CP–22–CR–0001927–2011 for crimes the Commonwealth alleged he committed from 2007–2009. As the trial court explained:

> The[se] charges were filed by the OAG based on handwritten documents including meeting notes taken by Appellant and/or Jill Seaman and provided to the OAG pursuant to subpoena that were alleged to have been falsified. Witnesses were presented who testified that they recalled saying or hearing certain statements in the recorded notes, but that others were false.

TCO, at 24.

Appellant's argument is two-fold. First, he alleges that the notes were not false and, second, he asserts that he did not personally give the notes to the OAG, or direct another to do so for him. Although there was more than one statement within the notes that the Commonwealth alleged had been tampered with and falsified, Appellant was not charged with separate violations for each individual instance of tampering or falsification. Accordingly, if the

evidence was sufficient to establish one instance of tampering or falsification, the Commonwealth would have carried its burden to establish both the offenses of hindering apprehension or prosecution and obstructing administration of law.

William Tomaselli testified that he was present at the meeting on February 27, 2007, during which the notes in question were taken, and that he was able to identify Jill Seaman as the author of the meeting notes due to his familiarity with her handwriting (he had worked with her for two years), and because he specifically recalled that she had taken notes at the meeting. N.T., 10/4/11, at 72–73. Regarding a statement attributed to Appellant in the notes regarding Edge, a computer program developed by GCR, the following exchange occurred with Tomaselli on direct examination:

Q. Now, in the notes there is a point next to Brett hyphen, using the Edge would be an ongoing crime. Do you see that there?

A. Yes, I do.

Q. Do you remember that occurring at the meeting?

A. I don't remember that, no.

Q. Is that something you would remember?

A. Probably, yes.

Q. Why?

A. It is a very strong statement.

*Id.* at 75.

Appellant complains that "the Commonwealth seeks to sustain a criminal conviction for obstruction of justice on testimony by a witness who *could not recall* the allegedly false statement being made, but was willing to say that he thought *if that statement had been made* he *probably* would remember it. That is not quite proof beyond a reasonable doubt." Appellant's Brief, at 61 (emphasis in original). Appellant adds that John Hanley testified that Appellant had made that statement to

him "personally" at another time, but not at the February 27, 2007, meeting. N.T., 10/19/11, at 184. Thus, Appellant argues, "[t]he prosecutions own evidence thus established that the 'falsehood' may have been nothing more than either a lapse of memory by Mr. Tomaselli or a disagreement on the date by Mr. Hanley." Appellant's Brief, at 63.

 The trial court determined that this "argument appears to go to the weight of the evidence rather than the sufficiency of the evidence." TCO, at 25. We agree. Appellant's argument amounts to nothing more than a dispute regarding the credibility of Tomaselli's testimony. While Tomaselli's testimony lacked absolute certainty regarding whether Appellant had made the statement at the meeting, it was not evidence of a nature that was "so weak and inconclusive that as a matter of law no probability of fact may be drawn." *Lambert*, 795 A.2d at 1014. "[T]he trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence." *Id.* Here, the weight given to Tomaselli's testimony, considering both his lack of absolute certainty, and Hanley's recollection of events, was a matter of credibility rightfully left to the jury.

Appellant also claims that "the evidence of obstruction was also insufficient since the Commonwealth failed to prove that [Appellant] committed any affirmative act to assure that the handwritten notes were delivered or 'provided' to the OAG." Appellant's Brief, at 64. Appellant asserts that the meeting notes were provided to the OAG by attorneys Mark Rush and David Overstreet of K & L Gates, counsel for the HRC, pursuant to several subpoenas, and that he neither directed K & L Gates to provide the notes to the OAG nor was he consulted by K & L Gates attorneys regarding the transfer. *Id.* at 65.

The crime of obstructing administration of law or other governmental function ("obstruction of justice") is defined by 18 Pa.C.S. § 5101, which provides as follows:

A person commits a misdemeanor of the second degree if he intentionally obstructs, impairs or perverts the administration of law or other governmental function by force, violence, physical interference or obstacle, breach of official duty, or any other unlawful act, except that this section does not apply to flight by a person charged with crime, refusal to submit to arrest, failure to perform a legal duty other than an official duty, or any other means of avoiding compliance with law without affirmative interference with governmental functions.

18 Pa.C.S. § 5101.

The crime of hindering apprehension or prosecution is defined by 18 Pa.C.S. § 5105(a), which reads:

(a) **Offense defined.**—A person commits an offense if, with intent to hinder the apprehension, prosecution, conviction or punishment of another for crime or violation of the terms of probation, parole, intermediate punishment or Accelerated Rehabilitative Disposition, he:

(1) harbors or conceals the other;

(2) provides or aids in providing a weapon, transportation, disguise or other means of avoiding apprehension or effecting escape;

(3) conceals or destroys evidence of the crime, or tampers with a witness, informant, document or other source of information, regardless of its admissibility in evidence;

(4) warns the other of impending discovery or apprehension, except that this paragraph does not apply to a warning given in connection with an effort to bring another into compliance with law; or

(5) provides false information to a law enforcement officer.

18 Pa.C.S. § 5105(a).

The trial court explained its factual findings regarding Appellant's convictions at CP–22–CR–0001927–2011 as follows:

During the course of the investigation by the OAG, which took place over years, several subpoenas were issued and served on the HRC requesting that broad categories of documents be produced to the OAG and the Grand Jury. A specific request for the handwritten notes was made by the OAG by way of a March 30, 2009 email to attorneys for the law firm of K & L Gates, counsel to the HRC, and subsequently referred to James Mann, senior legal counsel for the HRC for response. The March 30, 2009 email in which the OAG requested the documents specifically stated that "this should not require a new subpoena since it falls within the ambit of existing subpoenas." Nothing in the record indicates that any party's counsel disputed the fact that the handwritten notes that were requested were within the ambit of existing subpoenas. Attorneys for K & L Gates responded to the March 30, 2009 email request and Mr. Mann acted to comply with the request.

Mr. Mann testified to reviewing subpoenas that had been served on the HRC during Appellant's tenure as the individual responsible for subpoena compliance for the HRC while the OAG investigation was in progress. Examples of documents requested in subpoenas in 2008, prior to Mr. Mann's employment with the HRC, include any documents or records whether electronic or any other form starting January 1, 2002 for any campaign work performed regarding an extensive list of HRC employees; documents regarding the Edge; and documentation, whether or not electronically

stored, referencing Aristotle and certain named Aristotle employees, from January 1, 2003 to the present. The fact that subpoenas were already in place that requested the documents sought in the March 30, 2009 email is supported by the March 31, 2009 email response by K & L Gates that they "have the originals of the *previously produced handwritten notes.*" Further, testimony presented by Mark Rush, Esquire, an attorney for K & L Gates, revealed that handwritten documents that were "not intact," or were a subset of a whole, had been delivered in November 2008 by Jill Seaman, and that the delivery of the documents was not in satisfaction of any particular request. It was at this time that counsel for HRC realized that the documents that had been delivered were subject to existing subpoenas.

Appellant was Chief Counsel to the HRC and in charge of compliance with subpoena requests prior to December 19, 2008, when Mr. Mann was hired and directed to assume subpoena compliance duties. Mr. Mann testified that while carrying out his duties he would report subpoena compliance activity with Appellant and Jill Seaman. When Mr. Mann was 'acting to comply' with the March 30, 2009 document request, he discovered that he could not find photocopies of certain originals which fell within the purview of the OAG's document request. Mr. Mann was told by Jill Seaman that the missing originals were in the possession of Jane Penny, Esquire, Appellant's personal attorney at the time. This selective set of handwritten notes were clearly within a grouping of documents which should have been produced much earlier than the March 2009 request, at the time when Appellant was charged with subpoena compliance. The selective set of handwritten notes, without explanation in the record, ended up in possession of

his personal attorney. Additionally, Mr. Rush testified that he did not consult with Jill Seaman regarding the missing notes because they were the property of the HRC.

Without resistance, counsel for the HRC produced the handwritten notes that the OAG requested under the auspices of existing subpoenas that had been served and partially responded to as far back as November 2008. The valid subpoenas requested documents that should have been produced much earlier than the March 2009 OAG request, specifically during a time frame when Appellant was the responsible individual for complying with subpoenas for the HRC pursuant to the OAG's investigation. Missing handwritten notes that should have been produced at an earlier date were found in the possession of Appellant's personal attorney, without explanation as to how that came about. Testimonial evidence was presented that the notes which were produced were not accurate and/or false. The evidence presented was sufficient to permit a jury to draw inferences regarding the intentional action by Appellant to conceal and/or alter the handwritten notes to provide false information to law enforcement.

TCO, at 26–28 (internal citations and footnotes omitted).

Appellant contends that both 18 Pa.C.S. § 5101 and § 5105 "require an affirmative act by the Defendant intended to obstruct justice or hinder apprehension." Appellant's Brief, at 65. Appellant asserts that when "allegedly false answers are given only in response to questions asked by a police officer, there is no voluntary act as required by" the hindering apprehension statute. *Id.* For this proposition, Appellant cites to *Commonwealth v. Gettemy,* 404 Pa.Super. 504, 591 A.2d 320 (1991).

In *Gettemy*, this court held "that providing false answers in response to questions initiated by law enforcement officers does not constitute hindering apprehension or prosecution." *Id.* at 323. In reaching that conclusion, this Court found persuasive the official comment to the statute which stated that it had been derived from Section 242.3 of the Model Penal Code (MPC). The comment to section 242.3 of the MPC itself states that the crime "prohibits, volunteering false information to the law enforcement authorities. Mere failure to report a crime is not proscribed by this section. Neither is giving misleading or even false answers to inquiries initiated by the police. . . . This provision is intended to reach those who take the initiative in throwing the police off track." *Id.* (quoting from the official comment to section 242.3 of the MPC).

■ *Gettemy* is factually distinguishable from the instant case. It was not alleged that Appellant provided false answers to questions directly asked by police. Rather, it was alleged, and sufficiently demonstrated, that Appellant and/or his co-conspirator, Jill Seaman, first withheld documents that should have been turned over to the OAG pursuant to several subpoenas in 2008, and altered those documents with falsehoods at some point prior to when they were finally turned over to the OAG. A reasonable inference could be drawn by the jury that the only way the meeting notes ended up in Appellant's private attorney's possession was because of an affirmative act on the part of Appellant and/or his co-conspirator. Furthermore, the act of altering the notes was itself an affirmative act. Either of these acts, but certainly both in combination, demonstrate that Appellant and his co-conspirator "intentionally obstruct[ed], impair[ed], or pervert[ed]" the investigation by "physical interference or obstacle, breach of official duty, or any other unlawful act" in violation of 18 Pa.C.S. § 5101. Similarly, such conduct also fulfills the elements of 18 Pa.C.S. § 5105(a), as Appellant and/or his co-conspirator, "with intent to hinder the apprehension, prosecution, conviction or punishment of another for crime . . . conceal[ed] . . . evidence of the crime, or tamper[ed] with a . . . document or other source of information[.]" 18 Pa.C.S. § 5105(a)(3).

Appellant incorrectly asserts that 18 Pa. C.S. § 5105(a) "expressly provides that a person only commits the offense if he 'provides false information to a law enforcement officer,'" as set forth in subsection (a)(5). Appellant's Brief, at 65. Clearly, the statute only requires that sufficient evidence proving one of the five elements contained within § 5105(a) to demonstrate a violation of the hindering apprehension or prosecution statute, as is evidenced by the use of the word "or" in subsection (a)(4). Here, sufficient evidence was presented to sustain a conviction under subsection (a)(3). Accordingly, we conclude that evidence, viewed in a light most favorable to the Commonwealth, sufficiently demonstrates violations of both 18 Pa.C.S. § 5101 and 18 Pa.C.S. § 5105, as well as the related conspiracy counts.

### Void for Vagueness

In Appellant's final issue, he asserts that the conflict of interest provisions of the Public Official and Employee Ethics Act ("the Ethics Act" or "the Act"), 65 Pa.C.S. §§ 1101–1113, are unconstitutionally vague or unconstitutionally vague as applied in the instant case. However, "[i]t is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." *United States v. Mazurie*, 419 U.S. 544, 550, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975). As Appellant does not "develop an argument demonstrating that his claim is a First Amendment issue[,]" our review is

limited to whether the Ethics Act is unconstitutionally vague as applied to him. *Habay*, 934 A.2d at 738.

 Appellant contends that he was only "incidentally charged with using his own office staff to conduct campaign or fundraising which benefitted himself" as "[t]he principle charges against [him] were that actions he took benefitted the Pennsylvania Republican Party, or the House Republican Caucus." Appellant's Brief, at 70. He claims that it "was never proven at trial that anything [Appellant] did in reference to any of those counts benefited or was intended to benefit 'himself, a member of his immediate family or a business with which he or a member of his immediate family is associated.' " *Id.* (quoting from 65 Pa.C.S. § 1102).

The Ethics Act provides that "[n]o public official or public employee shall engage in conduct that constitutes a conflict of interest." 65 Pa.C.S. § 1103(a). The Act defines "conflict of interest" as follows:

> Use by a public official or public employee of the authority of his office or employment or any confidential information received through his holding public office or employment for the private pecuniary benefit of himself, a member of his immediate family or a business with which he or a member of his immediate family is associated. The term does not include an action having a de minimis economic impact or which affects to the same degree a class consisting of the general public or a subclass consisting of an industry, occupation or other group which includes the public official or public employee, a member of his immediate family or a business with which he or a member of his immediate family is associated.

65 Pa.C.S. § 1102.

In *Habay*, we considered a challenge to the same conflict of interest provision of the Ethics Act at issue here. Habay argued that "the vagueness arises because the statute does not define the phrase 'Use ... of the authority of his office or employment' or the phrase 'for the private pecuniary benefit of himself[.]' " *Habay*, 934 A.2d at 738. In addressing Habay's claim, we first acknowledged the applicable principle and standards of the void-for-vagueness doctrine as set forth in *Commonwealth v. Thur*, 906 A.2d 552 (Pa.Super.2006):

> Due process demands that a statute not be vague. *Commonwealth v. Mayfield*, 574 Pa. 460, 832 A.2d 418, 422 (2003); *Commonwealth v. Barud*, 545 Pa. 297, 681 A.2d 162, 165 (1996). A statute is vague if it fails to give people of ordinary intelligence fair notice as to what conduct is forbidden, or if they cannot gauge their future, contemplated conduct, or if it encourages arbitrary or discriminatory enforcement. *Commonwealth v. McCoy*, 895 A.2d 18, 30 (Pa.Super.2006). A vague law is one whose terms necessarily require people to guess at its meaning. *Mayfield*, 832 A.2d at 422. If a law is deficient—vague—in any of these ways, then it violates due process and is constitutionally void. *Id.*
>
> By contrast, to be valid, a penal statute must set forth a crime with sufficient definiteness that an ordinary person can understand and predict what conduct is prohibited. *McCoy*, 895 A.2d at 30. The law must provide reasonable standards which people can use to gauge the legality of their contemplated, future behavior. *Mayfield*, 832 A.2d at 422; *Barud*, 681 A.2d at 165; *Commonwealth v. Mikulan*, 470 A.2d at 1343 (Pa.1983) (plurality); *McCoy*, 895 A.2d at 30.
>
> At the same time, however, the void for vagueness doctrine does not mean that statutes must detail criminal conduct with utter precision. "Condemned to the use of words, we can never expect

mathematical certainty from our language." *Mikulan*, 470 A.2d at 1343 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 110–12, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)). Indeed, due process and the void for vagueness doctrine are not intended to elevate the "practical difficulties" of drafting legislation into a "constitutional dilemma." *Id.* (quoting *Colten v. Kentucky*, 407 U.S. 104, 110, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972)). Rather, these doctrines are rooted in a "rough idea of fairness." *Id.* As such, statutes may be general enough to embrace a range of human conduct as long as they speak fair warning about what behavior is unlawful. *Id.* Such statutes do not run afoul of due process of law. *Id.*

*Thur*, 906 A.2d at 560.

We then concluded that the conflict of interest provision of the Ethics Act was not unconstitutionally vague:

> The phrases challenged by [Habay] use commonly understood words in readily comprehensible ways. There is nothing unclear about the concept of using the authority of an office to obtain private pecuniary benefit. The statute prohibits people who hold public offices from exercising the power of those offices in order to secure financially related personal gain.
>
> [Habay] had fair notice and could easily predict that, in his capacity as an elected representative, he was not allowed to direct state-paid employees under his authority to conduct campaign and/or fundraising-related work, during state-paid time, for his personal benefit. Through his actions, [Habay] secured a private monetary advantage for himself because, by having state employees work for him on his campaign and/or fundraising tasks while they were being paid by the state, he obtained the benefit of free campaign work funded by the

taxpayers. In this same vein, [Habay], by virtue of using state employees, did not have to spend his own money to pay workers involved in such matters. The words of the statute surely allowed [Habay] to understand that such conduct was prohibited by law. He could have easily gauged his contemplated actions and predicted they were unlawful.

*Habay*, 934 A.2d at 738.

Here, Appellant claims that, unlike what had occurred in *Habay*, he did not act for his own pecuniary benefit, but instead only acted for the benefit of his political party. This is a distinction without a difference. Even if Appellant could demonstrate that his use of taxpayer funded resources for campaign purposes was done exclusively for the benefit of the Republican Party, he still incurred a private pecuniary benefit, because he did not have to spend his own money in support of that political party. Appellant exercised the power of his office to muster taxpayer funded resources for a cause of his own choosing outside of the legislative process. Whether a political party, a charity, or an individual's bank account is the ultimate recipient of the misappropriated funds and resources is irrelevant to establishing a violation of the conflict of interest provision of the Ethics Act.

The Ethics Act provides fair notice that Appellant's conduct was and is illegal. A person of reasonable intelligence can understand that a theft is not rendered legal if the thief were to choose to donate the stolen goods or funds, in their entirety, to charity. Similarly, it is not reasonable to interpret "private pecuniary benefit" in the narrow manner Appellant suggests. Appellant "did not have to spend his own money" to provide the Republican Party with campaign resources, which is as much a private pecuniary benefit as if the money had been directed to his own campaign.

*Habay,* 934 A.2d at 738. In any event, in light of our decision in *Habay,* and because the state resources were spent on his own political party, Appellant's argument is facetious—clearly money spent on his own political party would indirectly benefit his own campaign, particularly considering the nature of the campaign technologies acquired with public funds and resources.

Appellant contends, however, that "[d]oubt has been cast on the continuing validity of the *Habay* case by the recent decision of the United States Supreme Court in" *Skilling v. United States,* 561 U.S. 358, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010). We disagree. In *Skilling,* the Supreme Court of the United States held that the honest services statute, 18 U.S.C. § 1346, was limited in application to bribe and kickback schemes, and that any additional interpretations, particularly those that "include[d] deprivations not only of money or property, but also of intangible rights," would run afoul of the vagueness doctrine. *Skilling,* 130 S.Ct. at 2926, 2931.

The statutory text of the honest services statute at issue in *Skilling* is not remotely similar to that of the instant case. Furthermore, the Commonwealth did not allege any sort of intangible right deprivation as the basis of charging Appellant with violations of the conflict of interest statute. Accordingly, *Skilling* does not undermine the holding in *Habay,* nor does it have any controlling or persuasive authority in the instant case. We conclude, therefore, that the conflict of interest provisions of the Ethics Act are neither so vague as to encourage arbitrary or discriminatory enforcement, nor do they lack sufficient definiteness such that an ordinary person could not understand and predict what conduct is prohibited. *See Thur,* 906 A.2d at 560. Accordingly, we conclude that the statute, as applied, satisfies due process and is not unconstitutionally vague.

Judgment of sentence affirmed.

Justice FITZGERALD files a concurring and dissenting statement.

## CONCURRING AND DISSENTING STATEMENT BY FITZGERALD, J.

I join in the majority opinion to reject Appellant's constitutional and sufficiency of the evidence challenges. I respectfully dissent because, in my view, Appellant, at the pretrial hearing upon the claim of prosecutorial misconduct, established a *prima facie* case that the Office of the Attorney General ("the OAG"), contrary to its policy, destroyed potentially material evidence in witness interview notes before transposition into the formal record of investigation (ROI). Under the circumstances of this case, I further conclude that Appellant demonstrated the need for an evidentiary hearing to establish a complete record to support a resolution of his claim that OAG acted in bad faith. Therefore, I concur in part, and dissent in part.

On July 1, 2011, Appellant joined in a defense pretrial motion to dismiss the charges due to prosecutorial misconduct. The joint motion included a request for an evidentiary hearing to (1) account for the materials destroyed, (2) establish the dates of the destruction, (3) determine the identity of the individual who directed and destroyed the materials, and (4) discover any documentation of the destruction. Joint Mot. to Dismiss Due to Prosecutorial Misconduct, 7/1/11, at 9. The OAG responded that the motion for dismissal was procedurally improper, requested an unconstitutional form of relief, and was meritless. Commonwealth's Resp. to Defs.' Joint Mot. to Dismiss Due to Prosecutorial Misconduct, 7/18/11, at 2. In addressing the merits of the defense motion, the OAG averred that it destroyed the handwritten

investigation notes pursuant to its policy, only after the details of all original handwritten notes were transposed into the ROI. *Id.* at 5.

The trial court heard arguments on July 20, 2011. Counsel for codefendant Jill Seaman noted that the ROI did not include summaries for 94 of the 183 witnesses who testified before the grand jury, or for 64 of the 85 potential trial witnesses named by the Commonwealth. N.T., 7/20/11, at 93–94. The OAG asserted that "the policy was followed in these prosecutions." *Id.* at 118. Defendants jointly reiterated their request for an evidentiary hearing, arguing, in relevant part, that the dates of destruction "are critical. It is a measure of the degree of misconduct and it will reveal the intent when those dates of destruction are known." *Id.* at 119–20.

The trial court questioned OAG's counsel regarding a passage in the grand jury transcript indicating that there had been a "disastrous proffer session." *Id.* at 125. The court asked, "Now you said your policy says that has to be transposed into the ROI. Would this disastrous proffer session be part of the ROI?" *Id.* The OAG replied, "The reason that **some of the notes I don't believe were transposed into the ROI** is because it is preserved in the grand jury testimony, which is actually more verbatim than what would be in the report." *Id.* (emphasis added).

The trial court, on July 29, 2011, denied the joint defense request for an evidentiary hearing and motion to dismiss. Order, 7/29/11, at 1. The court recognized that the request for dismissal or an evidentiary hearing did not present straightforward *Brady*[1] claims and "would perhaps better have been raised under the framework announced in *Commonwealth v. Snyder*, 599 Pa. 656, 963 A.2d 396 (2011)[,]" which no party cited. Order at 3 & n. 1. Never-

theless, the court concluded (1) the subject notes were destroyed pursuant to the OAG's policy; (2) the destruction of the notes was not a *per se* violation of *Brady*; and (3) that the defense failed to establish a right to relief. *Id.* at 3–4. Although the court acknowledged arguments that not all notes were properly memorialized in the ROI and that the grand jury transcripts did not adequately capture "possible underlying inconsistent statements," it determined that adequate relief was possible through "broad latitude on cross examination to explore any such statements and present issues of credibility to the jury." *Id.* at 4. In sum, the court found that the destruction of the notes did not rise to the level of a due process violation. *Id.*

Since the majority opinion has thoroughly discussed and summarized the governing law regarding the destruction of evidence, I reiterate only that the controlling issue "is thus limited to whether the OAG destroyed the interview notes in bad faith." *See* Majority Op. at 1112. Although I agree with the majority's exposition of the law, I differ in the application of the law to the circumstances of this case.

Instantly, the policy relied upon by the OAG required that "[a]ny **details within original handwritten investigative notes** ... be transposed into the investigative report." OAG Chief Mem. 2001–02, 7/24/11 (emphasis added). At the hearing on the joint defense motion to dismiss, the OAG indicated that some notes might not have been incorporated into the ROI, but justified those omissions based on the presence of grand jury transcripts. *See* N.T. at 125. The OAG's policy itself, however, provides no exception for omitting the transposition of notes based on "substantially more verbatim" records or grand jury transcripts. The OAG, furthermore,

1. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

provided no explanation responsive to the allegations that the ROI did not include summaries for more than half of the witnesses who testified before the grand jury and that the ROI did not contain summaries for more than three-quarters of the potential trial witnesses named by the Commonwealth.

Although "evidence destroyed outside a standard procedure is not *ipso facto* destroyed in bad faith[,]" *Snyder*, 963 A.2d at 406, I conclude disputed issues of material fact exist regarding the OAG's representation that it complied with its policy, which were not expressly resolved by the trial court. Thus, I would hold that an evidentiary hearing was required. *Cf. Commonwealth v. Chapman*, 255 Pa.Super. 265, 386 A.2d 994, 1004–05 (1978) (remanding for hearing to develop record regarding *Brady* claim). Moreover, if it is shown that evidence was destroyed in violation of the policy, then further inquiry into the circumstances surrounding the destruction of the evidence, as well as the nature of the evidence destroyed, would be necessary to determine the OAG's intent.

Thus, I concur in part and dissent in part.