J-S10024-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| RICHARD WALLACE COMO | |
| Appellant | No. 1687 EDA 2018 |

Appeal from the Judgment of Sentence March 16, 2018
In the Court of Common Pleas of Chester County
Criminal Division at No CP-15-CR-0000780-2015

BEFORE: GANTMAN, P.J.E., STABILE, J., and COLINS, J.[*]

MEMORANDUM BY STABILE, J.: **FILED NOVEMBER 23, 2020**

Appellant, Richard Wallace Como, appeals from a judgment of sentence of 3-23 months' imprisonment for two counts of theft by unlawful taking, two counts of theft by failure to make required disposition of funds, two counts of dealing in proceeds of unlawful activity, six counts of criminal attempt, and four counts of restricted activities—conflict of interest.[1] Appellant challenges the sufficiency and weight of the evidence on all charges. We affirm eleven of the sixteen convictions and reverse five convictions.

In 2014, Appellant was charged with multiple crimes relating to actions he took in his capacity as superintendent of the Coatesville Area School District ("CASD"). On January 26, 2018, a jury found Appellant guilty of sixteen out

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 3921, 3927, 5111, 901 and 65 Pa.C.S.A. § 1103, respectively.

of the twenty charges in the information but acquitted him on three counts of theft and one count of restricted activities—conflict of interest (Counts 15 through 18). On March 16, 2018, following a pre-sentence investigation, the trial court sentenced Appellant to concurrent terms of 3-23 months' imprisonment plus three years' probation on eight counts of conviction and concurrent terms of one year's probation on four other counts. The remaining counts of conviction merged for sentencing purposes. Appellant filed timely post-sentence motions, which the court denied, and a timely notice of appeal. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant raises the following issues in this appeal:

I. DID THE COMMONWEALTH PRESENT SUFFICIENT EVIDENCE TO SUSTAIN CONVICTIONS ON THE FOLLOWING COUNTS?

Count 1 - Theft by Unlawful Taking or Disposition (18 Pa. C.S.A. § 3921(a))

Count 2 - Theft by Failure to Make Required Disposition of Funds Received (18 Pa. C.S.A. § 3927(a))

Count 3 - Dealing in Proceeds of Unlawful Activities (18 Pa. C.S.A. § 5111(a)(1),(2))

Count 4 - Restricted Activities - Conflict of Interest (65 Pa. C.S.A. § 1103(a))

Count 5 - Theft by Unlawful Taking or Disposition (18 Pa. C.S.A. § 3921(a))

Count 6 - Theft by Failure to Make Required Disposition of Funds Received (18 Pa. C.S.A. § 3927(a))

Count 7 - Dealing in Proceeds of Unlawful Activities (18 Pa. C.S.A. § 5111(a)(1),(2))

Count 8 - Restricted Activities - Conflict of Interest (65 Pa. C.S.A. § 1103(a))

Count 9 - Criminal Attempt to Commit Theft by Unlawful Taking (18 Pa. C.S.A. § 901-§ 3921(a))

Count 10 - Criminal Attempt to Commit Theft by Unlawful Taking (18 Pa. C.S.A. § 901-§ 3921(a))

Count 11 - Criminal Attempt to Commit Theft By Failure to Make Required Disposition of Funds (18 Pa. C.S.A. § 910-§ 3927(a))

Count 12 - Criminal Attempt to Commit Theft by Failure to Make Required Disposition of Funds (18 Pa. C.S.A. § 901-§ 3927(a))

Count 13 - Criminal Attempt to Commit Dealing in Unlawful Proceeds (18 Pa. C.S.A. § 901-§ 5111(a)(1),(2))

Count 14 - Criminal Attempt to Commit Dealing in Unlawful Proceeds (18 Pa. C.S.A. § 901-§ 5111(a)(1),(2))

Count 19 - Restricted Activities-Conflict of Interest (Matt Como) (65 Pa. C.S.A. § 1103(a))

Count 20 - Restricted Activities-Conflict of Interest (Generator) (65 Pa. C.S.A. § 1103(a))

II. WAS THE VERDICT ON THE FOLLOWING COUNTS AND CHARGES AGAINST THE GREAT WEIGHT OF EVIDENCE (listing the same counts as in Issue I)?

III. DID THE TRIAL COURT INCORRECTLY INSTRUCT THE JURY TO DISREGARD [CASD'S] NEPOTISM POLICY BY CLAIMING THAT IT WAS "TRUMPED" BY STATE LAW?

IV. DID THE TRIAL COURT ERR IN FAILING TO RE-INSTRUCT THE JURY AS TO COUNTS ONE (1) THROUGH EIGHT (8) AS REQUESTED BY DEFENSE COUNSEL?

Appellant's Brief at 3-6.

In his first argument, Appellant challenges the sufficiency of the evidence underlying his convictions in Counts 1-14 and 19-20 of his criminal information. When reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. *Commonwealth v. Diamond*, 83 A.3d 119, 126 (Pa. 2013). "[T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence." *Commonwealth v. Colon-Plaza*, 136 A.3d 521, 525–26 (Pa. Super. 2016). It is within the province of the fact-finder to determine the weight to accord to each witness's testimony and to believe all, part or none of the evidence. *Commonwealth v. Tejada*, 107 A.3d 788, 792–93 (Pa. Super. 2015). The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. *Commonwealth v. Crosley*, 180 A.3d 761, 767 (Pa. Super. 2018). As an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder. *Commonwealth v. Rogal*, 120 A.3d 994, 1001 (Pa. Super. 2015).

Preliminarily, the Commonwealth contends that Appellant waived his sufficiency argument by neglecting to specify the elements that the Commonwealth failed to prove in his concise statement of matters complained of on appeal. *See Commonwealth v. Stiles*, 143 A.3d 968, 982 (Pa. Super. 2016) ("[i]n order to preserve a challenge to the sufficiency of the evidence on appeal, an appellant's [Pa.R.A.P.] 1925(b) statement must state with specificity the element or elements upon which the appellant alleges that the evidence was insufficient"). Although Appellant's concise statement is not a model of clarity, it manages to communicate the nature of the issues Appellant seeks to raise in this appeal. Accordingly, we proceed to the merits of Appellant's sufficiency argument.

Counts 1 through 3 of the information charged Appellant with theft of $4,137.75 in Student Council funds raised during a t-shirt fundraiser at CASD Senior High School. Count 4 charged Appellant with violating the conflict of interest provision in the Ethics Act, 65 Pa.C.S.A. §§ 1101-1113. In essence, these charges alleged that Appellant treated Student Council funds as his own by using them to purchase football rings for the football team and other individuals whom Appellant selected.

The relevant evidence concerning these counts is as follows. CASD has a school board with nine elected members. N.T. 1/18/18 at 81. The School Board approves a budget for schools, approves policies for schools, and hires and fires superintendents. *Id.* CASD's superintendent is in charge of CASD's

day-to-day management—the "CEO" of CASD to whom all employees and administrators answer. *Id.* at 84-85.

CASD's former controller testified that CASD controls various monetary funds. First, the General Fund funds the CASD's core operations, such as teacher salaries, textbooks, software and electricity. N.T. 1/22/18 at 53-54. The General Funds consists of taxpayer dollars as well as state and federal moneys. N.T. 1/18/18 at 85, 119. Second, the Student Activity Fund holds funds raised by students for student activity. *Id.* at 55. The high school Student Council has a separate Student Council account within the Student Activity Fund. *Id.* at 56, 125. Third, the Agency Fund holds funds for organizations within CASD that are not student organizations. *Id.* The CASD acts as trustee for Agency funds. *Id.* One account in the Agency Fund, Special Collections, is for special fundraisers, such as a fundraiser in the name of a deceased parent of a student. *Id.* at 57. A different sub-account is created for each special collection. *Id.* at 58.

Cathy Taschner, CASD's superintendent at the time of trial, read into evidence a Public School Code statute governing student organizations, 24 P.S. § 5-511(d), which provides:

> Notwithstanding the use of school property or personnel, it shall be lawful for any school or any class or any organization, club, society, or group thereof, to raise, expend, or hold funds, including balances carried over from year to year, **in its own name and under its own management, under the supervision of the principal or other professional employe of the school district designated by the board. Such funds shall not be the funds of the school district but shall remain**

**the property of the respective school, class, organization, club, society, or group.** The treasurer or custodian of such funds shall furnish to the school district a proper bond, in such amount and with such surety or sureties as the board shall approve, conditioned upon the faithful performance of his duties as treasurer or custodian. The premium of such bond, if any, shall be paid from the fund or funds secured thereby or from the funds of the school district, at the discretion of the board. The treasurer or custodian shall be required to maintain an accounting system approved by the board, shall deposit the funds in a depository approved by the board, shall submit a financial statement to the board quarterly or oftener, at the direction of the board, and shall submit the accounts to be audited in like manner as the accounts of the school district.

N.T. 1/18/18 at 97 (emphasis added). Section (a) of the same statute, 24 Pa.C.S.A. § 5-511(a), provides:

The board of school directors in every school district shall prescribe, adopt, and enforce such reasonable rules and regulations as it may deem proper, regarding (1) the management, supervision, control, or prohibition of exercises, athletics, or games of any kind, school publications, debating, forensic, dramatic, musical, and other activities related to the school program, including raising and disbursing funds for any or all of such purposes and for scholarships, and (2) the organization, management, supervision, control, financing, or prohibition of organizations, clubs, societies and groups of the members of any class or school, and may provide for the suspension, dismissal, or other reasonable penalty in the case of any appointee, professional or other employee, or pupil who violates any of such rules or regulations.

*Id.*

Pursuant to Section 5-511, to protect funds raised through student activity, the School Board enacted a policy that "student activity funds are restricted for student purposes of those students still in school and disbursements must be approved by the Board." Exhibit C-6 at 1. The student

activities fund is a "restricted fund reflecting all financial transactions of all the various student activity accounts." *Id.* A "student activity account" is "an accounting ledger which reflects all of the financial transactions of a particular group, club, class, society or other organization comprised of school pupils." *Id.* Funds in this account are subject to withdrawal through "requisitions by student groups," *id.* at 2, but only if the Student Council treasurer (a student), a faculty advisor (a school district employee appointed by the principal to administer the student activity) and the school principal approve the expenditure. *Id.* The School Board must approve the withdrawal as well. *Id.* at 1. Student activity funds "should be used to finance a program of activities not part of the regular curriculum." *Id.* at 5.

The policy states that "donations" from "student . . . or other groups" "shall be considered revenue of the secondary school's [S]tudent [C]ouncil." *Id.* at 4. The faculty advisor "shall render for deposit all money collected." *Id.* The faculty advisor has the duty to place "all money collected by the students . . . in an envelope" and document, among other things, "[the] source of money or reason for its collection." *Id.* The money then must be deposited into the bank. *Id.* at 3.

The policy prohibits multiple uses for Student Council funds, including "gifts, loans, credit or accommodations purchases for district employees or others who are not students." *Id.* at 6.

The Public School Code requires a majority of the School Board to approve a variety of items. In particular, Section 8-807.1 of the Code, 24 P.S. § 8-807.1, requires purchases of items over $18,500.00 to go through a bidding process in which CASD advertises the item in local newspapers for three weeks and vendors submit bids for the item. N.T. 1/18/18 at 94-95. All bids go to the School Board, which selects the winning bid by majority vote. *Id.*

Appellant was CASD's superintendent in 2012-13. He resigned sometime in 2013. Appellant attended college on a football scholarship, was an assistant coach on Duke University's football team and held football-related positions during his academic career. Coatesville High School's "Red Raider" football team was a perennial contender, and Appellant counted himself as one of its strongest supporters.

In the fall of 2012, the Red Raiders advanced to the PIAA Class AAA Championship Football Game in Hershey, Pennsylvania. Appellant envisioned rewarding the football players, coaches, administrators and others with rings commemorating the 2012 season. He did not want the students to have to pay for the rings. N.T. 1/22/18 at 139-41. Before the championship game, Appellant asked Tricia Domsohn, Coatesville High School's faculty advisor to Student Council, to have Student Council sell "Beast of the East" t-shirts as a fundraiser to support the football team. *Id.* at 16-17. Domsohn circulated

an email announcing the t-shirt sale, and Student Council held a t-shirt sale that raised $4,137.75 in cash.

Around the same time, Appellant contacted John Bagnell, who represents Jostens, a supplier of rings based in Illinois that wanted to win the CASD Senior High School account. Appellant asked Bagnell to have Jostens price rings designed in accordance with Appellant's specifications. Jostens initially priced the rings at $33,277.74, a sum greater than Appellant anticipated. N.T. 1/19/18 at 262-63. Appellant negotiated a reduction in cost to $19,935.00 in return for an agreement that Jostens would receive CASD Senior High School's business. *Id.* at 265-71. Appellant instructed Bagnell not to send one bill for the entire purchase price but to send three bills for installment payments, a process Bagnell found unusual. *Id.* at 274-75. By dividing the total price into three smaller bills, Appellant disguised the purchase price for the rings as less than $18,500.00, thus avoiding the mandatory bidding process and submission to the School Board for approval.

The t-shirt sale proceeds never went into Student Council's account. N.T. 1/22/18 at 15. Domsohn handed the proceeds in an envelope to Appellant. *Id.* at 19-20. Appellant summoned Paul Rose, CASD's controller, to his office and informed him that the proceeds were not Student Council funds but should be placed in a special account for the purpose of purchasing mementos for the football team. *Id.* at 58-59. Rose told Appellant that he would place the funds in an Agency Fund account instead of a Student Activity

- 10 -

Fund account, because Agency Fund monies were not managed by students. *Id.* at 60. Rose created an account for the t-shirt proceeds that he named the Red Raiders Spirit Day account. *Id.* at 58, 60. The first bill from Jostens was for $4,137.75, the sum raised in the t-shirt fundraiser, and stated misleadingly that the purchase related to "student award(s)," the term that Appellant asked Jostens to use. N.T. 1/19/18 at 279-80. On April 17, 2013, Rose issued a check to Jostens for $4,137.75 from the Red Raiders Spirit Day account. N.T. 1/22/18 at 67, 70.[2]

There was conflicting testimony as to whether Student Council members knew that the t-shirt sale proceeds would be used to purchase football rings. Domsohn claimed that the students agreed to this plan because they knew the proceeds did not belong to Student Council:

> Q: At some point and time, did you agree the Student Council kids would sell t-shirts to raise money for [Appellant]?
>
> A: Yes.
>
> Q: Prior to making that agreement, did you discuss that decision with the Student Council kids?
>
> A: They were very clear that this was not our sale.
>
> Q: Well, my question is: did you discuss that with the kids? Did you ask them before you agreed to sell t-shirts for [Appellant]? Did you ever have a conversation with the kids?

---

[2] As discussed below, Rose issued a second check to Jostens in late June 2013 for $6,931.50. Jostens did not receive the full purchase price; nor did it get the high school contract it was promised. We discuss the check for $6,931.50 below in our analysis of Counts 5 through 8 of the information.

A: I said to the kids, I am sure at some point, we are going to sell t-shirts for the football team.

Q: Are you saying you remember that conversation specifically or are you assuming entrusting that you had said that?

A: I'm trusting that is what I said . . . I can one hundred percent tell you those kids knew they were selling t-shirts for the football team. Whether [Appellant]'s name was involved, they knew. Hey guys, we were asked to do a fundraiser for the football team. This isn't our sale. This money is not going to us.

N.T. 1/22/18 at 18-19. Domsohn added that it was not a big deal for Student Council to raise funds for football rings, and the task was fun for Student Council because it heightened school spirit. *Id.* at 40-41.

Two Student Council members, however, testified that they did not know about any plan to use t-shirt sale proceeds to purchase football rings. Daylin Myers testified that Student Council did multiple fundraisers, and the money from these sales would "go into our Student Council account." N.T. 1/19/18 at 202. Student Council designed and sold the t-shirts in the school store during school hours, but it did not raise this money explicitly for the purpose of giving it to the football team or paying for the football team or administrators to get rings. *Id.* at 203-04. To Myers' recollection, nobody asked Student Council whether it approved of using t-shirt sales proceeds to pay for rings for administrators. *Id.* at 205. The second Student Council member, Taylor Chesnet, testified that Student Council sold t-shirts during lunch period. *Id.* at 211. She did not contemplate how the sales proceeds would be used. Nor did anyone ask for her permission for the money to go

into a football team account or pay for rings for school administration or the principal. *Id.* at 211-12.

Jostens delivered the rings directly to Appellant. *Id.* at 273. Appellant decided that 89 persons—64 players, 16 football coaches or trainers, 6 administrators (including himself) and 3 other "friends and family" (including the wife of a coach)—would receive rings. *Id.* at 224-34; exhibit C-26. Appellant personally informed the football teams that they would be receiving rings, and he selected some, if not all, of the administrators who were to receive rings. *Id.* at 224-34.

Count 1 of the information charged Appellant with theft by unlawful taking or disposition of the $4,137.75 in t-shirt sale proceeds. The Crimes Code defines theft by unlawful taking or disposition in relevant part as follows: "A person is guilty of theft if he unlawfully takes, or exercises unlawful control over, movable property of another with intent to deprive him thereof." 18 Pa.C.S.A. § 3921(a). The evidence demonstrates that Appellant violated Section 3921(a) by taking Student Council funds with intent to deprive the students of these funds. The Public School Code provides that student activity funds, such as the t-shirt funds raised by Student Council, "shall not be the funds of the school district but shall remain the property of the respective school, class, organization, club, society, or group." 24 P.S. § 5-511(d). Moreover, CASD's student activity funds policy, promulgated in accordance with Section 5-511(a), required all money from Student Council sales,

including the t-shirt proceeds, to go into Student Council's account, and prohibited removal of proceeds from this account without approval by the student treasurer, the faculty advisor (Domsohn), the principal (Fisher) and the School Board. Domsohn's assertion that the t-shirt sale proceeds did not belong to Student Council was wrong under the plain language of Section 5-511(d): the proceeds belonged to Student Council because it raised them through a school-related activity on school property during school hours. In violation of both Section 5-511(d) and a student activity funds policy designed to enforce this statute, Appellant diverted these funds from Student Council and had them spent according to his own desires. Specifically, he (1) obtained an envelope from Domsohn containing the proceeds of $4,137.75 without obtaining consent from the student treasurer or the School Board, (2) instructed CASD's controller, Rose, to place the proceeds into a special account instead of the Student Council account, (3) persuaded Jostens to bill him in three increments to circumvent the bidding and approval process required by law for purchases over $18,850.00, (4) persuaded Jostens to mislabel its first bill as "student awards," and (5) had Rose issue a check to Jostens for $4,137.75, again to circumvent the bidding and approval process. Appellant also had the rings delivered directly to him, and he treated the rings as his own by selecting the recipients of the rings: the football team, its coaches, several CASD administrators and Appellant himself. This evidence is sufficient to sustain Appellant's conviction on Count 1.

Domsohn defended Appellant's actions by testifying that Student Council members knew that the t-shirt proceeds were not going into the Student Council account and understood that they were raising funds for rings for the football team. Two Student Council members testified, however, that nobody told them that sale proceeds would go to purchase rings for the football team or administrators. Since our role as an appellate court is to view the evidence in the light most favorable to the Commonwealth, we must accept the students' version of events as true instead of Domsohn's. The evidence demonstrates that Appellant intentionally misappropriated the funds in violation of the Student Council's rights under the CASD policy and without its knowledge or consent.

Count 2 of the information charged Appellant with theft by failure to make required disposition of funds. The Crimes Code defines this offense as follows:

> A person who obtains property upon agreement, or subject to a known legal obligation, to make specified payments or other disposition, whether from such property or its proceeds or from his own property to be reserved in equivalent amount, is guilty of theft if he intentionally deals with the property obtained as his own and fails to make the required payment or disposition. The foregoing applies notwithstanding that it may be impossible to identify particular property as belonging to the victim at the time of the failure of the actor to make the required payment or disposition.

18 Pa.C.S.A. §3927(a). The Commonwealth must prove that the defendant (1) obtained the property of another; (2) subject to an agreement or known legal obligation upon the receipt to make specific payments or other

disposition thereof; (3) intentionally dealt with the property obtained as if it were the defendant's own; and (4) failed to make the required disposition of the property. ***Commonwealth v. Ohle***, 470 A.2d 61, 69 (Pa. 1983).

As discussed above, the Public School Code and CASD's policy required the deposit of the $4,137.75 from t-shirt sales into Student Council's account. Appellant prevented disposition of these funds into Student Council's account by obtaining the sales proceeds from Domsohn and directing Rose to place them in a special Red Raiders account. Subsequently, again at Appellant's instruction, Rose sent a check to Jostens for $4,137.75. Jostens sent the rings directly to Appellant, who distributed them to recipients that he selected, including himself. Through this scheme, Appellant intentionally dealt with the t-shirt sale proceeds as if they were his own and failed to make required disposition of this money. This evidence was sufficient to sustain Appellant's conviction on Count 2.

Count 3 charged Appellant with dealing in proceeds of unlawful activities under 18 Pa.C.S.A. § 5111(a)(1) and (2). The evidence is insufficient to sustain Appellant's conviction under this count because the Student Council funds were not "proceeds of unlawful activity."

Section 5111 provides:

(a) Offense defined. A person commits a felony of the first degree if the person conducts a financial transaction under any of the following circumstances:

(1) With knowledge that the property involved, including stolen or illegally obtained property, represents the proceeds of unlawful

- 16 -

activity, the person acts with the intent to promote the carrying on of the unlawful activity.

(2) With knowledge that the property involved, including stolen or illegally obtained property, represents the proceeds of unlawful activity and that the transaction is designed in whole or in part to conceal or disguise the nature, location, source, ownership or control of the proceeds of unlawful activity.

18 Pa.C.S.A. § 5111(a). A "financial transaction" is "a transaction involving the movement of funds by wire or other means or involving one or more monetary instruments. The term includes any exchange of stolen or illegally obtained property for financial compensation or personal gain." 18 Pa.C.S.A. § 5111(f). "Unlawful activity" is "any activity graded a misdemeanor of the first degree or higher under Federal or State law." *Id.* There is no definition of "proceeds" in the statute.

To define "proceeds," we conclude we may look for guidance to how federal courts have defined this term within the federal money laundering statute, 18 U.S.C. § 1956.[3] Originally enacted in 1986, Section 1956 appears

---

[3] 18 U.S.C. § 1956 provides in relevant part that the defendant is guilty of money laundering if,

knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

(A)(i) with the intent to promote the carrying on of specified unlawful activity; or . . .

(B) knowing that the transaction is designed in whole or in part--

- 17 -

to have been the model for Section 5111, which our own legislature enacted three years later. **Compare** 18 Pa.C.S.A. § 5111(a)(1), (2) **with** 18 U.S.C. § 1956(a)(1). Since the language of these statutes is substantially similar, it is permissible to use Section 1956 as a tool for construing Section 5111. **See**, **e.g.**, **Office of Administration v. Pennsylvania Labor Relations Board**, 916 A.2d 541, 550 (Pa. 2007) ("[O]ur Court has not hesitated to consider, and to follow, federal interpretation of the NLRA due to the similarity between the federal labor law and our own laws dealing with labor relations").

We find particularly helpful the district court's analysis of "proceeds" in **United States v. Maali**, 358 F.Supp.2d 1154 (M.D.Fl. 2005):

> While § 1956 does not define "proceeds," the term is a "commonly understood word in the English language." **United States v. Haun**, 90 F.3d 1096, 1101 (6th Cir.1996). While there is disagreement among courts as to whether "proceeds" contemplate "net profits," "gross receipts," or "gross profits," that issue concerns not so much the ordinary meaning of "proceeds" as it does the precise scope of the term . . . By contrast, where the basic meaning of "proceeds" is concerned, courts are generally in accord.
>
> Definitions of "proceeds" which courts have cited include "the amount of money received from a sale," Black's Law Dictionary 1222 (7th ed.), "the sum, amount, or value of property sold or converted into money or into other property," Black's Law Dictionary 1204 (6th ed.1990), and "that which is obtained ... by any transaction," The Compact Edition of the Oxford English

---

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity. . .

18 U.S.C. § 1956(a)(1).

Dictionary 2311 (1971 & Supp.1985) . . . When reduced to their most basic elements, these definitions simply provide that "proceeds" are something which is obtained in exchange for the sale of something else as in, most typically, when one sells a good in exchange for money.

*Id.* at 1158.

Given Section 1956's linguistic similarities with Section 5111, we will apply *Maali's* analysis to Section 5111. Accordingly, "proceeds" within Section 5111 means "something which is obtained in exchange for the sale of something else, *e.g.*, a sale of a good in exchange for money."

Next, to define the phrase "proceeds of unlawful activity" in Section 5111, we combine the definition of "proceeds" in the preceding paragraph with Section 5111(f)'s definition of "unlawful activity," "any activity graded a misdemeanor of the first degree or higher under Federal or State law." "Proceeds of unlawful activity," we hold, means "something obtained from a sale that itself constitutes a first degree misdemeanor or higher under federal or state law." As but one example, money resulting from a sale of illegal drugs constitutes "proceeds of unlawful activity."

Applying this definition to Count 3, we conclude that there were no proceeds of unlawful activity, because the activity that generated the money, Student Council's sale of t-shirts, was perfectly legal. Absent this element, Appellant's conviction under Count 3 cannot stand.

Count 4 charged Appellant with violating 65 Pa.C.S.A. § 1103, the conflict of interest statute in the Ethics Act (sometimes referred to as "Act"). We conclude that the evidence is sufficient to sustain Appellant's conviction on this count.

The purpose of the Act is to prevent public officers and officials from "realiz[ing] personal financial gain through public office other than compensation provided by law." 65 Pa.C.S.A. § 1101.1(a). The Act is remedial legislation with the salutary purpose of assuring the integrity and honesty of the Commonwealth employees and, as such, must be "liberally construed." *Maunus v. State Ethics Comm'n*, 544 A.2d 1324, 1328 (Pa. 1988).

The Act provides: "No public official or public employee shall engage in conduct that constitutes a conflict of interest." 65 Pa.C.S.A. § 1103(a). Violation of Section 1103 constitutes a felony that subjects the offender to a maximum of five years' imprisonment. 65 Pa.C.S.A. § 1109(a).

The Act defines "conflict of interest" as

> [u]se by a public official or public employee of the authority of his office or employment or any confidential information received through his holding public office or employment for the private pecuniary benefit of himself, a member of his immediate family or a business with which he or a member of his immediate family is associated. The term does not include an action having a *de minimis* economic impact or which affects to the same degree a class consisting of the general public or a subclass consisting of an industry, occupation or other group which includes the public official or public employee, a member of his immediate family or a business with which he or a member of his immediate family is associated.

- 20 -

65 Pa.C.S.A. § 1102.

The Act defines "authority of office or employment" as "[t]he actual power provided by law, the exercise of which is necessary to the performance of duties and responsibilities unique to a particular public office or position of public employment." *Id.* A public official or employee violates the Act when he uses the authority of his office to receive private pecuniary benefit for himself, an immediate family member or a business with which he or an immediate family member is associated. *Id.* To prove "pecuniary benefit," the Commonwealth "must show some private financial gain." *Commonwealth v. Veon*, 150 A.3d 435, 463 (Pa. 2016). Intangible political gain does not constitute private pecuniary benefit. *Id.* No violation of the Act occurs when, *inter alia*, the action in question has *de minimis* economic impact or affects to the same degree a group which includes the public official or employee. *Id.*

In this case, Appellant used the authority of his office to transfer funds into the Red Raiders special account and then to Jostens, which sent him the football rings. Remaining for resolution is (1) whether Appellant received private pecuniary benefit by receiving the rings from Jostens and then distributing them to the 88 other football players, coaches, administrators and friends, and (2) whether these actions fit within the *de minimis* or class/subclass exceptions to conflict of interest. Based on the Commonwealth Court's analysis in *Keller v. State Ethics Commission*, 860 A.2d 659 (Pa.

Cmwlth. 2004),[4] we hold that Appellant received private pecuniary interest, and that his actions do not fit within either exception.

In *Keller*, the mayor of New Hope, who received annual compensation between $1,500.00 to $2,500.00, had the authority to perform marriage ceremonies. He informed couples that he would perform marriage ceremonies if they provided him money that he planned to donate to local non-profits or charities. He generally received $150.00 per ceremony, and, over a four-year period, collected $16,000.00 in donations. He deposited the receipts in a personal savings account he maintained and controlled and later donated the money to charitable, service or non-profit agencies. The State Ethics Commission determined that the mayor violated the Act when he received payments for performing marriage ceremonies and deposited those funds in a personal bank account:

> The argument that [the mayor] did not receive prior pecuniary benefits because he subsequently donated the fees to charities is unavailing. [The mayor] received financial gains when he deposited the funds into his personal bank account . . . The controlling elements are the performance of marriage ceremonies by [the mayor] followed by the deposit of the fees into his personal bank account when there was no authorization in law for him to do so. Such actions by [the mayor] violated the Ethics Act. The subsequent actions by [the mayor] to make payments to various charities did not retroactively undo the Ethics Act violation.

*Id.*, 860 A.2d at 664-65.

_____

[4] Decisions of the Commonwealth Court are not binding upon this Court but may serve as persuasive authority. *Carmen Enterprises, Inc. v. Murpenter LLC*, 185 A.3d 380, 393 n.2 (Pa. Super. 2018).

> The Commonwealth Court affirmed, reasoning:
>
> > [The mayor] accepted the money, made deposits into his own personal bank account and determined when, where, how much, and to whom the money went . . . The Commission did not err when it determined that [the mayor] realized a private pecuniary benefit. He treated the amount he received as his own money. Although [he] ultimately gave away the money, he still obtained more than $16,000.00 in a four year period. Albeit that it was "donated," it was still for his personal use through the exercise of the authority of his office.

*Id.* at 665. The Court rejected the mayor's argument that his actions had *de minimis* economic impact, stating, "While the average fee was not overwhelming, it was not a meager or symbolic amount. Further, if [the mayor] had deposited this amount with the Borough, the Borough's treasury would have been enriched by $16,000." *Id.* The Court also determined that the mayor's actions did not fit within Section 1102's class/subclass exception:

> The salient point to determine was whether the person receiving the benefit was part of the general public or a specific class. Here, [the mayor], himself, received the benefit. He was not in the same class as the couples he married. Further, the general public did not receive any benefit. [The mayor] was the only person to directly benefit from the couples' payments.

*Id.* at 668. *Keller*, the Supreme Court noted in *Veon*, "hinged upon the proposition that the mayor's receipt of the monies in question constituted a private pecuniary benefit, regardless of the funds' final destination."[5] *Veon*, 150 A.3d at 447.

---

[5] *See also Commonwealth v. Feese*, 79 A.3d 1101, 1127 (Pa. Super. 2013) ("Whether a political party, a charity, or an individual's bank account is the

In view of **Keller**, we hold that Appellant's receipt of the rings from Jostens was a private pecuniary benefit. Just as the mayor in **Keller** was the only person who received the wedding monies and decided where to donate them, Appellant alone received the rings through the exercise of the authority of his office, and he unilaterally decided to whom to award them. Although he ultimately shared the rings with others, his direct receipt of the rings "constituted a private pecuniary benefit, regardless of [their] final destination." **Veon**, 150 A.3d at 447 (construing **Keller**). Further, the receipt of the rings did not have *de minimis* impact, because they were worth $19,935.00, more than the funds that the mayor received in **Keller**. In addition, Section 1102's class/subclass exception only applies when an action "**affects to the same degree** a class consisting of the general public or a subclass consisting of an industry, occupation or other group which includes the public official or public employee, a member of his immediate family or a business with which he or a member of his immediate family is associated." 65 Pa.C.S.A. § 1102 (emphasis added). Appellant's use of his authority as CASD's superintendent to use Student Council monies to pay Josten's for

---

ultimate recipient of the misappropriated funds and resources is irrelevant to establishing a violation of the conflict of interest provision of the Ethics Act"). We focus more heavily on **Keller** than **Feese** because the facts in **Keller** more closely resemble the present case. **Keller** involved misappropriations of money. **Feese** involved, to a large extent, a legislator's misappropriation of state employees' time by requiring them to devote their workdays to partisan political campaigns instead of their government jobs. **Id.**, 79 A.3d at 1118-21, 1127-28.

rings, as well as his receipt of the rings, affected him more than any other person. Like the mayor in **Keller**, he alone decided which individuals would ultimately receive the bounty of his actions. For these reasons, the evidence was sufficient to prove that Appellant's guilt under the Act.

Counts 5 through 8 accuse Appellant of a second theft of $6,931.50 from Student Council to obtain funds for the rings. The record reflects that in June 2013, Appellant asked Domsohn whether there were any funds in the Student Council account. Domsohn replied that there was $8,000.00 in the account. Appellant asked "to borrow" this money and directed Domsohn how to transfer it. Appellant told Domsohn: "I am going to have to take some of that money out, but I'll replace it for you." N.T. 1/22/18 at 26. Domsohn was uncomfortable transferring money from this account because it belonged to Student Council. Nevertheless, she signed the transfer form, as did the high school principal, Mr. Fisher. No Student Council representative signed the form; nor did the School Board approve the transfer. Rose filled out a transfer form to move the $8,000.00 into the Red Raiders special account. **Id.** at 75-77. Appellant directed assistant superintendent Angelo Romaniello to instruct Rose to send a check to Jostens for $6,931.50 from the special account. **Id.** at 84-86, 172-74. Romaniello forwarded Appellant's instruction to Rose, who

withdrew $6,931.50 from the special account and sent a check to Jostens in this amount on June 20, 2013.[6]  *Id.* at 85-86; exhibit C-48.

Count 5 alleges that Appellant committed theft by unlawful taking or disposition under 18 Pa.C.S.A. § 3921(a) (the same statute underlying Count I) with regard to the $6,931.50.  The Public School Code provides that student activity funds, such as funds raised by Student Council, "shall not be the funds of the school district but shall remain the property of the respective school, class, organization, club, society, or group."  24 P.S. § 5-511(d).  Moreover, CASD's policy governing student activity funds prohibited removal of the $8,000.00 from the Student Council account without approval by the student treasurer, the faculty advisor (Domsohn), the principal (Fisher) and the School Board.  Appellant diverted this sum from Student Council's Account by obtaining Domsohn's and Fisher's approval but without seeking or obtaining the approval of the student treasurer or the School Board.  Appellant had these monies placed into the Red Raiders special account and directed payment of a check to Jostens in the amount of $6,931.50.  As was the case with the first check to Jostens, the relatively small amount of this check was part of Appellant's scheme to disguise the actual purchase price for the rings and to circumvent the bidding and approval process for purchases above

---

[6] Although Appellant originally planned for a third payment to go to Jostens in August 2013, N.T. 1/22/18 at 174, no such payment took place.

$18,850.00. This evidence was sufficient to sustain Appellant's conviction on Count 5.

Appellant convinced Domsohn to approve the withdrawal of $8,000.00 from Student Council's account by representing it as a loan that he promised to "replace," *i.e.*, repay. As a matter of law, this excuse was invalid, because CASD's policy prohibits loans or credit of Student Council funds to district employees. The simple fact is that Appellant unlawfully took and/or exercised unlawful control over property belonging to Student Council and dedicated to student activities.

Appellant insists that the Commonwealth failed to prove intent to deprive under Section 3921 because he promised to "replace" the money. We disagree. We held in **Commonwealth v. Grife**, 664 A.2d 116 (Pa. Super. 1995), a prosecution involving the theft by deception statute, 18 Pa.C.S.A. § 3922, that when the defendant obtains money through intentional falsehoods, "intent to repay does not necessarily negate the crime of false pretenses." **Id.** at 120. "That [the defendant] might have had plans to pay the creditors back is of no moment." **Id.** at 119. The same logic holds true under Section 3921. When the defendant "takes[] or exercises unlawful control" over another's property under Section 3921(a), his intent to "replace" that property in the future is irrelevant. The only pertinent inquiry is whether he intends to deprive the victim of property at the time of the taking. Appellant intended to deprive

Student Council (and by extension, the students) of monies at the time he obtained them from Student Council's account.

Count 6 alleges that Appellant committed theft by failure to make required disposition under 18 Pa.C.S.A. § 3927(a) with regard to the $6,931.50 (the same statute underlying Count II). The evidence shows that Student Council funds obtained by Appellant were subject to known legal obligations, the Public School Code's provision governing student activity funds in 24 P.S. § 5-511(d) and CASD's policy governing student activity accounts. This policy prohibited disposition of student activity funds except upon approval of the Student Council treasurer, faculty advisor, school principal and School Board. The same policy prohibited loans or credit from student activity accounts to district employees. Appellant failed to make required disposition of the funds by obtaining them as a loan for himself without obtaining the permission of the student treasurer and School Board. He intentionally used the funds as his own by directing Rose to pay them to Jostens for football rings. Thus, the evidence was sufficient to sustain Appellant's conviction on this count.

Count 7 accused Appellant of dealing in proceeds of unlawful activities with regard to the $6,931.50 in violation of 18 Pa.C.S.A. § 5111(a)(1) and (2) (the same statute underlying Count 3). The evidence is insufficient to sustain Appellant's conviction under Count 7 for the same reason as in Count 3: the

funds that Appellant misappropriated were untainted Student Council monies, not "proceeds of illegal activity."

Count 8 charged Appellant with violation of the conflict of interest provision of the Ethics Act, 65 Pa.C.S.A. § 1102. The evidence is sufficient to sustain Appellant's conviction under Count 8 for the reasons that we gave regarding Count 4. Appellant received private pecuniary benefit, football rings from Jostens, through the exercise of his official authority, and he alone decided who would receive the rings. The receipt of the rings was not *de minimis* and did not fall within the class/subclass exception to the conflict of interest provision.

Counts 9, 11 and 13 charged Appellant with attempt-related offenses relating to $5,913.50 that was deposited improperly within the Red Raiders special account but was never paid to Jostens. Count 9 alleged attempt to commit theft by unlawful taking, Count 11 alleged attempt to commit theft by failure to make required disposition of funds, and Count 13 alleged attempt to commit dealing in unlawful proceeds. We conclude that the evidence was sufficient to sustain Appellant's convictions on Counts 9 and 11, but not Count 13.

The record establishes that the registration period for summer school took place from June 17 to June 27, 2013. N.T. 1/22/18 at 150. Students paid summer school tuition either in checks or cash. *Id.* at 152. At Appellant's direction, Romaniello told CASD's business office to deposit the cash into the

Red Raider special account, *id.* at 159, even though summer school tuition deposits must go into the General Fund. *Id.* at 78. In addition, a check dated May 18, 2013 from the Track and Field Coaches Association of Greater Philadelphia for $1,000.00 was deposited into the Red Raider account. *Id.* at 74; exhibit C-48. Along with the check was a handwritten note stating, "Mr. Richard Como [Appellant], thanks, TFCA of GP." *Id.* Checks such as this normally went into the General Fund. *Id.* at 74. On July 9, 2013, the final date of activity in the Red Raiders special account, the balance of the account was $5,918.50 due to the deposits of summer school cash tuition and the track and field check. Ultimately, this money was not paid to Jostens, and there is no evidence it was actually misspent.

The Crimes Code provides: "A person commits an attempt when, with intent to commit a specific crime, he does any act which constitutes a substantial step toward the commission of that crime." 18 Pa.C.S.A. § 901(a). A critical step in Appellant's theft was the siphoning of money into the Red Raiders special account. Sending money to Jostens from a special account was far less conspicuous than sending money from Student Council's account that by law belonged to students, or from the General Fund that come from taxes and state and federal sources. Thus, diversion of summer school tuition and the track and field check from the General Fund to the Red Raiders special account was an important step towards paying Jostens with General Fund money. In our view, this was a substantial step towards (1) theft by unlawful

taking, because it paved the way for Appellant to unlawfully take or exercise control over taxpayer money that he did not have the right to take or control, and (2) theft by failure to make required disposition, because it paved the way for Appellant to treat funds that legally were property of the General Fund as his own. On the other hand, it was not an attempt to deal in proceeds of unlawful activities. As was the case with the Student Council funds, the summer school tuition and ATF check were untainted, not the "proceeds of unlawful activities" under Section 5111(a). For these reasons, Appellant's challenge to the sufficiency of the evidence underlying Counts 9 and 11 fails, but his challenge to Count 13 has merit.

Counts 10, 12 and 14 charge Appellant with the same series of attempt-related offenses as Counts 9, 11, and 13 (attempt to commit theft by unlawful taking, attempt to commit theft by failure to make required disposition of funds, and attempt to commit dealing in unlawful proceeds), but this time pertaining to his instruction to transfer $15,000.00 from the General Fund into the Red Raiders special account. We reject Appellant's challenge to the evidence underlying Counts 10 and 12, but we agree with his challenge to Count 14.

The evidence concerning these charges arises from the testimony of Romaniello and Rose. Romaniello was promoted by Appellant to the position of assistant superintendent and reported directly to Appellant. N.T. 1/22/18 at 135. Romaniello's office was in Appellant's building, and he met with him

daily. *Id.* In the spring of 2013, Appellant told Romaniello to have Rose transfer $15,000.00 from the General Fund to the Red Raiders special account. N.T. 1/22/18 at 145. Romaniello told Rose to make this transfer. *Id.* at 92. Rose testified that he performed the transfer on June 28, 2013, but later that day, Romaniello told him that "we're not doing that [the transfer]." *Id.* at 93. Similarly, Romaniello testified that he told Rose that the S15,000.00 "did not need to be transferred." *Id.* at 145. On June 30, 2013, Rose transferred the $15,000.00 from the Red Raiders special account back to the General Fund. *Id.*

The evidence was sufficient to sustain Appellant's convictions on the attempted theft charges in Counts 10 and 12. As we reasoned above with regard to the summer school tuition and ATF check, the transfer of the $15,000.00 from General Fund to the Red Raiders special account was an attempt to commit theft, because siphoning money into the special account was a substantial step in Appellant's scheme.

Appellant claims unsuccessfully that he renounced his attempt by having the funds transferred back to the General Fund. The Crimes Code provides:

> (1) In any prosecution for an attempt to commit a crime, it is a defense that, under circumstances manifesting a voluntary and complete renunciation of his criminal intent, the defendant avoided the commission of the crime attempted by abandoning his criminal effort and, if the mere abandonment was insufficient to accomplish such avoidance, by taking further and affirmative steps which prevented the commission thereof.

> (2) A renunciation is not "voluntary and complete" within the meaning of this subsection if it is motivated in whole or part by:

> (i) a belief that circumstances exist which increase the probability of detection or apprehension of the defendant or another participant in the criminal enterprise, or which render more difficult the accomplishment of the criminal purpose; or
>
> (ii) a decision to postpone the criminal conduct until another time or to transfer the criminal effort to another victim or another but similar objective.

18 Pa.C.S.A. § 901(c). When the evidence is undisputed, the court can find as a matter of law that the defendant has established a criminal defense such as renunciation. **Commonwealth v. Wright**, 578 A.2d 513, 521 (Pa. Super. 1990) (where no dispute existed as to operative facts, court can determine whether uncontradicted testimony establishes defense of entrapment as matter of law).

The record does not establish that Appellant himself renounced the transfer of General Fund monies to the special account. Romaniello at first instructed Rose to effectuate the transfer but later called it off by saying "we're not doing that." Rose then transferred the money back to the General Fund. Unfortunately for Appellant, the record does not clarify the meaning of "we're." It could mean "Romaniello and Appellant are not doing that" since Romaniello reported to and worked closely with Appellant—but it could also mean "Romaniello and Rose are not doing that," since Romaniello spoke these words to Rose. Because we must view the evidence in the light most favorable to the Commonwealth, we must adopt the latter construction, which constrains

us to conclude that Appellant did not renounce the transfer of General Fund monies.

Turning to Count 14, the General Fund monies were not the "proceeds of unlawful activities" under Section 5111(a). They were untainted taxpayer funds. Without this element, Appellant's conviction under Count 14 cannot stand.

Count 19 accused Appellant of violating the Ethics Act by procuring a job for his son, Matthew Como, as a CASD night supervisor, a custodial position. The requirements for this position included three to five years' experience in custodial supervising. N.T. 1/18/18 at 224. The evidence demonstrates that in June 2008, CASD advertised a job opening for this position based on a job description authored by Pedro Quinones, CASD's manager of facilities and grounds, and Bob Foley. *Id.* at 221-23. Quinones reviewed multiple applications, interviewed candidates and selected someone other than Matthew, but Foley told Quinones to "squash" any plans to hire that applicant. *Id.* at 224-27.

Appellant's girlfriend, Becky Layfield, filled out Matthew's job application for the night supervisor position and submitted it to CASD. *Id.* at 54-55, 57. The work history in his application did not include any prior custodial position or three to five years' experience in custodial supervising. *Id.* at 58-59. At that point, Appellant's secretary instructed Quinones to go to Appellant's office for a meeting. There, Appellant informed Quinones that he was going to hire

Matthew as night supervisor and asked if Quinones "had a problem with it." *Id.* at 228. Quinones answered "no." *Id.* Quinones had never seen an application from Matthew or interviewed him, and he was not happy that Appellant selected Matthew instead of the candidate Quinones wanted. *Id.* at 229. Quinones declined to sign the human resource paperwork for hiring Matthew, stating, "I didn't hire him. You guys hired him. You can sign it. I'm not signing it." *Id.* at 233. Nobody signed the form. *Id.* Appellant informed the Board about his relationship to Matthew, and the School Board approved Matthew's hiring in April 2009. N.T. 1/23/18 at 61-64. Before the Board approved Matthew, however, neither Appellant nor anyone else informed the Board that (1) Quinones had interviewed other persons for this position and selected another candidate, (2) Quinones had not seen an application from Matthew or interviewed him, or (3) Appellant called Quinones into his office and told Quinones that he was going to hire Matthew.

Matthew became a CASD employee on July 1, 2009. The average annual pay raise for CASD employees in Matthew's group (Act 93 noncertificated) was 4.45% over their previous year's salary. N.T. 1/18/18 at 158-60. Appellant, as superintendent, was the person who decided which, if any, employees would receive raises above 4.45%. *Id.* at 160-61. During Matthew's years of employment for CASD, his direct supervisor did not recommend that he receive a raise. N.T. 1/19/18 at 13. Nevertheless, in his first five years of

employment, his salary rose 78% over his starting salary, from $50,000.00 to $88,808.00. *Id.* at 104-05.

The evidence demonstrates that Appellant used the authority of his position for his son's pecuniary benefit. He placed his son before the School Board as the lone candidate for the job by overriding Quinones' selection for the night supervisor position, selecting his son instead, and failing to inform the School Board about these behind-the-scene steps he took to position his son as the candidate. During Matthew's first five years of employment, Appellant approved raises for Matthew far in excess of average raises for employees in Matthew's group. Accordingly, the evidence was sufficient to sustain Appellant's conviction under Count 19.

Count 20 charged Appellant with violating the conflict of interest provision of the Ethics Act through his sale of a generator to CASD. In our opinion, the evidence did not establish any violation.

Between 2011 and 2012, CASD purchased a fourteen kilowatt generator from Appellant for $3,000.00. According to CASD's business manager, Ken Lupold, Appellant purchased a generator during a home renovation project with his own proceeds. The generator proved to be too small to carry the load in Appellant's house, so Appellant approached Lupold to determine "if the school district needed a generator." N.T. 1/24/18 at 12-13. According to Lupold, "[Appellant] came to me and told me that the generator is too small that he bought and 'could the district use one.' And [CASD's maintenance

supervisor] Bob Foley assured me that the district could, and therefore I approved it." *Id.* at 13-14. Appellant offered to sell the generator to CASD for $3,000.00. *Id.*

Lupold testified that CASD needed a generator, because on various occasions, in particular following a severe hurricane, the school district lost power, and all of the food in its freezers spoiled. *Id.* at 28-31. He testified:

> Q: Okay. So in terms of a necessity, can you tell the jury how much it costs to replace all the food that was lost when that refrigerator lost power?
>
> A: I remember it was significant, but I don't remember a dollar amount.
>
> Q: And the school district didn't have insurance to cover that; is that right?
>
> A: Yes.
>
> Q: Can you tell the jury how much the school district had to pay for the taxpayers' account to replace the food they lost because they did not have a generator to operator that freezer when the power went out?
>
> A: I do not recall the amount.
>
> Q: Very large amount of money, because it was a very large amount of food. Can we at least agree with those parameters?
>
> A: Yes.
>
> Q: Okay. So in terms of necessity, you couldn't disagree with me, sir, that having a generator keep that refrigerator going would prevent future massive losses that we have just described?
>
> A: I never disagreed with that.
>
> Q: Okay. So . . . the school district needed a generator based on this concept. Wouldn't you agree?

A: Yes.

Q: Okay. So this fellow wasn't selling a bill of goods to the school district that weren't required or necessary, or needed when it came to the generator.  Fair?

A: Fair.

*Id.* at 32-33.  Lupold continued:

Q: [Appellant] "asked" if we could use the generator, right?

A: Yes.

Q: He didn't order you to purchase a generator, he asked?

A: I never said he ordered me.

*Id.* at 34.  Lupold did not immediately accept Appellant's proposal.  Instead,

he investigated whether CASD needed a generator:

Q: And when he "asked", you endeavored as the business manager, to find out if the school district needed one, correct?

A: Yes.

Q: And you went to Mr. Foley [CASD's manager of facilities and grounds], because you believed Mr. Foley would be the man to tell you whether or not they needed one, right?

A: Yes.

Q: And you testified on direct today that Mr. Foley said, yeah, we could use a generator, right?

A: Yes.

Q: There was nothing Mr. Foley said to you, based on your own personal experience with the food loss and the power loss, that created any conflict in your mind that the generator was required, right?

A: Yes.

*Id.* at 34-35.

Lupold reviewed Appellant's purchase invoice and admitted that Appellant paid $3,307.49 to purchase the generator but sold it to CASD for $3,000.00. Thus, Appellant lost $307.49 in the exchange. *Id.* at 37-38.

In addition, the sale of the generator did not violate any CASD policy, bidding requirements or contract requirement policies. Lupold testified:

> Q: So aside from the loss that [Appellant] took in the selling of this generator to the school district, his purchase of the generator complied with all of the Coatesville School District guidelines on bidding, did it not?
>
> A: It didn't require a bid.
>
> Q: It did not require bidding, correct?
>
> A: Correct.
>
> Q: Because in your position as the business manager, certain things required bids, don't they?
>
> A: Yes.
>
> Q: And because this only costs the school district three thousand dollars, this fell below the bidding threshold at the school district?
>
> A: Yes.
>
> Q: Right? So you didn't have to advertise that the district needed a generator and submit bids, right?
>
> A: Correct.
>
> Q: So that purchase of this complied with all of the regulations of the school district, didn't it?
>
> A: Yes.

Q: Okay. And so did [Appellant]'s disclosure that this was something he wanted to sell. He didn't hide it from you, right?

A: Correct.

Q: He didn't hide the nature of how he came to possess it from you, did he?

A: No.

Q: He didn't hide from you or anybody for that matter how he was interested in selling it, right?

A: Right.

*Id.* at 39-40.

School Board member Neil Campbell agreed that Appellant was not required to disclose the sale of the generator to the board members:

Q: Mr. Campbell, there was nothing that required [Appellant] to come and ask you for your permission to sell the generator. You're not aware of any guideline that required -- to be fair, right?

A: No. To be fair, there was hundreds and hundreds of transactions.

Q: And, in fact, sir, your permission as board member was not required for [Appellant] to sell the generator to the school district?

A: No.

Q: Correct?

A: Correct.

Q: And if the generator costs less than forty-two hundred dollars [Appellant] was [not] even required to submit it to a bidding process; isn't that true?

A: I believe so.

Q: And that happens to be found right inside the Coatesville School District policies, correct?

A: Yes.

N.T. 1/23/18 at 59-60.

A "conflict of interest" occurs under the Ethics Act when the defendant "use[s] . . . the authority of his office or employment or any confidential information received through his holding public office or employment" for private pecuniary benefit. 65 Pa.C.S.A. § 1102. There is no evidence that Appellant used the authority of his office or employment to sell the generator to CASD. Appellant did not demand that CASD purchase the generator; he offered to sell a generator he did not need. The circumstances of the sale indicate that it was an arms-length transaction. CASD's business manager, Lupold, did not simply agree to purchase the generator but asked Foley whether CASD actually needed it. Foley advised that CASD needed the generator as an emergency backup for power outages, since it had suffered substantial lost revenue from food spoilage during a prior outage and wanted to prevent this problem from recurring. Nor was a bidding process or permission of the School Board necessary under the law, because CASD paid less than $4,200.00 to purchase it.

The trial court attempted to justify Appellant's conviction on this count by recounting details that it considered suspicious. The court pointed out that Appellant conceived the idea to sell the generator to CASD because Dana Beach, the contractor who performed home renovation work for Appellant,

was unable to sell the generator himself. Opinion Denying Appellant's Post-Sentence Motions, May 11, 2018, at 6-7. CASD's sales invoice for the generator listed Beach as the vendor instead of Appellant, but Beach indorsed the check over to Appellant, and Appellant's girlfriend deposited the check into Appellant's account. *Id.* Although we must construe the evidence and all reasonable inferences therefrom in the light most favorable to the Commonwealth, it is unreasonable to infer from these details that the sale took place due to Appellant's exercise of the power of his position.[7] Appellant's conviction under Count 20 cannot stand.

In summary, the Commonwealth furnished sufficient evidence to sustain Appellant's convictions on Counts 1, 2, 4, 5, 6, 8, 9, 10, 11, 12 and 19 of the information. We reverse Appellant's convictions on Counts 3, 7, 13, 14 and 20 due to insufficiency of the evidence.

Next, Appellant contends that the verdict was against the weight of the evidence. We disagree.

The law pertaining to weight of the evidence claims is well-settled:

> The weight of the evidence is a matter exclusively for the finder of fact, who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. A new trial is not warranted because of "a mere conflict in the testimony" and must have a stronger foundation than a reassessment of the

---

[7] Since we reverse on this ground, we need not address whether Appellant received "pecuniary benefit" from the sale of the generator despite selling it for less than he paid. We leave it to a future court to determine whether "pecuniary benefit" requires proof that the defendant made a profit or simply received something in exchange.

credibility of witnesses. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.

On appeal, "our purview is extremely limited and is confined to whether the trial court abused its discretion in finding that the jury verdict did not shock its conscience. Thus, appellate review of a weight claim consists of a review of the trial court's exercise of discretion, not a review of the underlying question of whether the verdict is against the weight of the evidence." An appellate court may not reverse a verdict unless it is so contrary to the evidence as to shock one's sense of justice.

*Commonwealth v. Gonzalez*, 115 A.3d 711, 723 (Pa. Super. 2015).

The trial court explained concisely why it denied Appellant's post-sentence objection to the weight of the evidence:

If everything was above board, why all the Machiavellian intrigue of acting through others and disguising what was being done? The obfuscation employed to conceal what was being done was corroborative circumstantial evidence that [Appellant] knew his conduct was illegal. The jury had as complete a picture of what occurred as could be presented. The fact that the jury believed the Commonwealth's evidence does not shock my conscience in the least. When each action [Appellant] took or directed to be taken is looked at in the context of everything else that was occurring, the conclusion that things were intentionally being done opaquely is inescapable. One acts opaquely when one has something to hide. Here, the jury concluded that it was criminal conduct [Appellant] was attempting to hide, a conclusion supported by ample evidence.

Opinion, 5/11/18, at 8-9. We agree with this analysis insofar as it relates to Counts 1, 2, 4, 5, 6, 8, 9, 10, 11, 12 and 19, the counts in which the evidence was sufficient to sustain Appellant's convictions. The trial court acted within its discretion by denying Appellant's challenge to the weight of the evidence relating to these counts.

Appellant next contends that the trial court incorrectly instructed the jury that the Ethics Act "trumped" CASD's nepotism policy. No relief is due.

During trial, Appellant contended that he complied with CASD's nepotism policy in connection with the hiring of Matthew Como. In response, the trial court instructed the jury:

> And the fact that there is a Nepotism Policy in place and everybody talked about the Nepotism Policy and explained it and opined whether they were in accordance with it or not, is irrelevant, because the Ethics Act contains what is known as conflict of law provision. And the Ethics Act simply says the provisions of this Act apply no matter what. So even though Coatesville has a Nepotism Policy that would permit the hiring of someone if it was made known to the School Board is not a defense to the Ethics violation if you find that Mr. Como was actively involved in the hiring process of his son. If he was a mere conduit simply sending the word up, hey, they decided on my son, I had nothing to do with it, no Ethics violation. On the other hand, if you find, based on your review of the evidence, that he was actively involved in it or discussing it, etc., then, of course, it would be a violation and it would not be protected conduct under the Nepotism rules because the Ethics Act trumps the Nepotism Policy that the County or that the School District had in place.

N.T. 1/25/18 at 171-72.

> In examining the propriety of jury instructions,

> a trial court presents to a jury, our scope of review is to determine whether the trial court committed a clear abuse of discretion or an error of law which controlled the outcome of the case. A jury charge will be deemed erroneous only if the charge as a whole is inadequate, not clear or has a tendency to mislead or confuse, rather than clarify, a material issue. A charge is considered adequate unless the jury was palpably misled by what the trial judge said or there is an omission which is tantamount to fundamental error. Consequently, the trial court has wide discretion in fashioning jury instructions.

***Commonwealth v. Sandusky***, 77 A.3d 663, 667 (Pa. Super. 2013).

- 44 -

The Ethics Act provides: "Except as otherwise provided in Chapter 13 (relating to lobby regulation and disclosure), if the provisions of this chapter conflict with any other statute, ordinance, regulation or rule, the provisions of this chapter shall control." 65 Pa.C.S.A. § 1112. Based on this text, the trial court correctly instructed the jury that the Ethics Act "trumped" CASD's nepotism policy, and that the critical question was whether Appellant complied with the Act, not with the nepotism policy.

In his final argument, Appellant maintains that the trial court erred by failing to re-instruct the jury on Counts 1 through 8 during the opening statements to the jury. Appellant argues that re-instruction became necessary when it became clear that the Commonwealth's theory of liability was confusing and at odds with the facts. Appellant's Brief at 80-81. Appellant claimed that he requested during opening statements that the court re-instruct the jury. We have reviewed the trial court's opening instructions as well as both parties' opening statements. There was no request at any time for re-instruction. Accordingly, Appellant waived this argument.

Our reversal of Counts 3, 7, 13, 14 and 20 does not upset the trial court's sentencing scheme, because multiple concurrent sentences of 3-23 months' imprisonment plus three years' probation plus concurrent terms of one year's probation remain intact on the remaining counts. Accordingly, no remand for resentencing is necessary.

Judgment of sentence affirmed on Counts 1, 2, 4, 5, 6, 8, 9, 10, 11, 12 and 19. Judgment of sentence reversed on Counts 3, 7, 13, 14 and 20.

Judgment of sentence affirmed in part and reversed in part. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/23/20